CARPENTER STEEL CO. v. NORCROSS.

(Circuit Court of Appeals, Sixth Circuit. April 11, 1913.)

No. 2,285.

1. MASTER AND SERVANT (§ 37*)—CONTRACT OF EMPLOYMENT—BREACH—DISCHARGE—MISCONDUCT.

In an action for breach of a contract of employment by discharging plaintiff for alleged misconduct, it is a sufficient defense that plaintiff had been guilty of the misconduct alleged, and that it was such as to justify a discharge, though the employer did not know of the misconduct

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

alleged at the time of the discharge, or other misconduct was made the basis thereof.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 12, 43; Dec. Dig. § 37.*]

2. **MASTER AND SERVANT** (§ 30*)—**CONTRACT OF EMPLOYMENT—BREACH—DISCHARGE—MISCONDUCT.**

Misconduct to justify a servant's discharge must be misconduct in the service, or misconduct prior to service, and proof of moral fraud on the part of the servant in concealing it from the master.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 30–36; Dec. Dig. § 30.*]

3. **MASTER AND SERVANT** (§ 30*)—**CONTRACT OF EMPLOYMENT—DISCHARGE—MISCONDUCT.**

While conduct of an employé involving moral turpitude, willful insubordination, or habitual neglect will justify a discharge, the general rule is that the servant owes the master the duty of faithfulness, whether expressed in the contract of employment or not, and that any conduct on the servant's part which amounts to unfaithfulness, or which witnesses an unfaithful disposition, or a disposition which is likely to issue in unfaithfulness, is misconduct justifying a discharge.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 30–36; Dec. Dig. § 30.*]

4. **MASTER AND SERVANT** (§ 43*)—**CONTRACT OF EMPLOYMENT—BREACH—DISCHARGE—MISCONDUCT—QUESTIONS FOR JURY.**

Where plaintiff was employed as manager of defendant's branch warehouse in Cleveland, Ohio, maintained for the sale of high-grade steel in large part to the automobile trade, and was given a bank account from which to pay the expenses of his branch warehouse, etc., evidence that in entertaining purchasing agents in the trade at an automobile show in New York he was guilty of excessive drinking, visiting a gambling resort, consorting with lewd women, and committed other acts of dissipation, and that he made advances out of his deposit account to employés under him and to customers, and also at times used portions thereof for his own benefit in paying life insurance premiums, etc., did not show such misconduct as warranted his discharge as a matter of law; such question being one of fact for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 57, 58; Dec. Dig. § 43.*]

In Error to the Circuit Court of the United States for the Eastern Division of the Northern District of Ohio; William L. Day, Judge.

Action by George B. Norcross against the Carpenter Steel Company. Judgment for plaintiff, and defendant brings error. Affirmed.

W. D. Turner and M. B. & H. H. Johnson, all of Cleveland, Ohio, for plaintiff in error.

Carpenter, Young & Stocker, W. H. Boyd, and D. C. Westenhaver, all of Cleveland, Ohio, for defendant in error.

Before WARRINGTON and DENISON, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. This suit was brought in the lower court by defendant in error, George B. Norcross, against plaintiff in error, the Carpenter Steel Company, to recover $43,600 as damages for breach of a contract of employment by wrongfully discharging him therefrom. It resulted in a verdict and judgment for $3,000.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The sole error assigned is the refusal by the court, at the close of all the evidence, to give a peremptory instruction to the jury to find for defendant, to which refusal it duly excepted.

The company is a corporation engaged in the manufacture and sale of the higher grades of steel at Reading, Pa. A large portion of its output is sold to manufacturers of automobiles, and of parts thereof. Norcross was in its employ in the dual capacity of salesman for the states of Ohio, Michigan, and Indiana, possibly the most important territory covered by the company, with headquarters at Cleveland, Ohio, and of manager of its branch warehouse located at that place. In both positions he had a number of employés under him. At the time of his discharge he had been in its employ for over four years, under three successive contracts of employment. The terms of the first two were for two years each, the first beginning January 1, 1906, and the second, January 1, 1908. The third and last one, then in course of performance, was for five years, beginning January 1, 1910. It was entered into November 10, 1909. The discharge took place January 15, 1910, in the middle of the first month after the beginning of this term. At first Norcross's position was that of salesman merely. He became manager, also, during the first term, to wit, on July 7, 1907, when the branch warehouse was first established. On the occasion of each renewal he received an increase in salary. His salary during the second term was $350 per month. By the last contract it was provided that he should receive $5,000 per year, payable monthly, and 3.20 of 10 per cent. of the net annual income of the company, to the extent of $25,000, which, if it amounted to that, and there was a reasonable probability that it would, would yield him additionally $3,750, payable semiannually. He received, in addition to his salary, his personal expenses; reimbursement for each month's expenses being made on the tenth day of the succeeding month. The last contract, in its enlargement of the term of employment and its increase of compensation, bespoke that his services were regarded as highly valuable. It was testified that during his employment he had brought business to it amounting to as much as $1,250,000.

The defense to the suit was that he had been guilty of such misconduct as to justify his discharge; the particular misconduct relied on as constituting the justification being specified in defendant's pleadings. That relied on in its original answer, filed May 6, 1910—the suit having been brought March 2, 1910—happened subsequent to the beginning of the then contract of employment and just previous to the discharge. In an amended answer, filed nearly a year afterwards and just before the trial, to wit, on April 29, 1911, it set up, in addition, misconduct that happened prior to the beginning thereof, but during the previous terms, mainly during the second or immediately preceding one. The former miscond·  was the sole basis of the discharge. The claim was that the latter was not then known.

To entitle plaintiff in error to a reversal, it is essential that, under the evidence, it was not possible for a fair-minded man to find that the defendant in error had not been guilty of the particular misconduct. alleged or that it was not such as to justify his discharge.

[1] It is not important that the company did not know of the mis-

conduct at the time of the discharge, or that other misconduct was made the basis of the discharge. It is sufficient that he had been guilty of the misconduct alleged, and that it was such as to justify his discharge. This is well settled. Main, if not sole, reliance is had on the misconduct which it was alleged in the amended answer Norcross had been guilty of prior to the beginning of his then contract of employment, which it is claimed was not known at the time of his discharge, and was not made the basis thereof, and which the company was somewhat belated in bringing to the attention of the court by amended answer, and to only a portion thereof. It is assumed that it is not possible for the fact that this misconduct did not happen under the contract of employment in force at the time of the discharge, but under the previous ones, to affect the matter. It was stated in oral argument that it was well settled that it could not. But I find no authorities dealing with just such a situation. Authorities may be found which determine the effect of misconduct prior to any service.

[2] They lay down that the general rule is that misconduct to justify a discharge must be misconduct in the service, and that, in order to justify a discharge on the ground of misconduct prior to service, the servant must have been guilty of a "moral fraud" in concealing it from the master when entering into the service. Wood, Master and Servant, p. 212.

Possibly the same rule, and none other, should apply where the misconduct relied on happened under a prior contract of employment of which that then in force may be said to be a renewal. The necessities of this case, however, do not call for a decision of this question, and it will be disposed of on the basis that this consideration does not affect its disposition.

[3] But, before dealing with this misconduct, that set up in the original answer and the other portion of that set up in the amended answer, which is of a similar character to that set up in the former, should be noticed. There is sufficient uncertainty as to whether reliance is not also had thereon to require that it should be. And preliminary thereto a word or two should be said as to the nature of the misconduct which the law makes a justification for a discharge. It is certain that conduct involving moral turpitude, willful insubordination, or habitual neglect is such misconduct as to justify a discharge. An early case limited justification thereto. But it is now well settled that any conduct which is prejudicial or likely to be prejudicial or injures or has a tendency to injure the master is misconduct that warrants a discharge. 20 A. & E. Enc. of Law, p. 27; 26 Cyc. pp. 988, 990.

In Wood, Master and Servant, p. 208, the law is stated thus:

"Misconduct prejudicial to the master's interests, although not exhibiting moral turpitude, is a good cause for the discharge of a servant. And conduct exhibiting moral turpitude, although productive of no damage to the master's interests, is a good ground for terminating the contract. Mere misconduct, not amounting to insubordination, or exerting a bad influence over other servants, or producing injury to the master's business, or members of the master's family, is not enough to warrant the discharge of a servant. The misconduct must be gross or such as is incompatible with the relation, or pernicious in its influence, or injurious to the master's business."

And again on page 220 the matter is put thus:

"In order to justify a master in discharging a servant the servant must have been guilty of conduct that amounts to a breach of some express or implied provision of the contract of hiring. Anything less than that will not amount to a legal justification or excuse. The mere fact that he has been guilty of improper or unbecoming conduct, or that he has, in some slight matters, been guilty of a violation of his master's orders, will not warrant his discharge; but his conduct must have been such as to involve moral turpitude and his insubordination must have been willful and such as is inconsistent with the relation which he holds to the master and the duties he owes him."

Possibly the matter may be put thus: The servant owes the master the duty of faithfulness, whether expressed in the contract of employment or not. It is an implied, if not an express, term thereof. It follows that any conduct on his part which amounts to unfaithfulness or which witnesses an unfaithful disposition, or better, perhaps, a disposition which is likely to issue in unfaithfulness, is misconduct calling for a discharge. It is, no doubt, because conduct involving moral turpitude witnesses such a disposition that it is such misconduct as to justify a discharge. It is in the light of these general principles that this case is to be disposed of.

[4] The misconduct relied on in the original answer consisted of dissipation and insubordination in the city of New York on the occasion of an automobile show held there, beginning Saturday evening, January 8, 1910. and ending Saturday evening, January 15th, on which day the discharge took place.

At that show the company had a small booth and made an exhibit of the articles, not very many, which it had for sale to the automobile trade. The insubordination complained of was, not attending at the booth pursuant to direction, and not keeping an appointment with its general manager at its New York office on the afternoon of Tuesday, the 11th. If it be assumed that such insubordination was sufficient to justify the discharge, there was such contrariety in the testimony as to whether Norcross had been in fact directed to attend at the booth, and such an explanation of his failure to keep the appointment as to require a submission of the matter of insubordination to the jury. It is not contended otherwise. The real complaint as to his conduct on this occasion has to do with his dissipation. It took the form of excessive drinking, association with loose women, and visiting a gambling resort. The conduct, of a similar character to this, relied on, in the amended answer, as having happened under the previous term of service, consisted of drinking to excess. That he so conducted himself on the occasion of this show and that he had at times during the previous term of service indulged in excessive drinking was admitted. The only question is as to whether such misconduct justified his discharge. It was to such an extent that possibly, ordinarily, it would have to be held that it amounted to a justification. Norcross' position in regard thereto was this: He so conducted himself in furthering the business of the company. It helped it along for him to furnish entertainment, and entertainment of this character, to the purchasing agents of its customers in the automobile trade. He could not do this without

taking part. And it was expected of him by the company that he should furnish such entertainment. He had been in the habit of attending automobile shows with no other purpose in view than this, and that was what took him to New York on this occasion. In his answer to the letter notifying him of his discharge, written by the president, he gave this account of his presence and course there:

"My principal object in going to the New York show was to meet my friends, the company's friends from out here, at a time when they would be free, and to entertain them in such manner as would best suit them. Now I know these people, otherwise we would not be doing the business that we are. I knew what these people wanted to see, and I showed it to them and there were not six hours during my stay that I was not with some good customer. That I can prove. Perhaps I overdid the thing, in which case I am sorry."

There was substantial evidence=evidence fit to induce conviction in support of this position. In view of it, it cannot be said that it was the duty of the lower court to hold as a matter of law that the company had a right to discharge him. If his position was true, such conduct was regarded by it as beneficial and not prejudicial to it, and it was indulged in at its instance, and could not, therefore, justify his discharge. That he seems to have liked to so conduct himself, and that at times he was unable to stand up, and had to resort to Turkish baths, and a six weeks' stay at Muldoon's, the latter with the company's consent, but, possibly, without its knowledge as to the true cause thereof, to keep himself in condition, did not make it otherwise. Possibly had he indulged more moderately he could have done better by the company, but everything points in the direction that, as it was, he was doing quite well by it. Possibly, also, had he continued in its service, a time might have come when his ability to serve it would have been so impaired by such a course of life that it would have been under no obligation to continue him in its employ. As to this no opinion is expressed. It is certain that it cannot be said as a matter of law that such a time had arrived when he was discharged. Until then, at least, the company had no right to discharge him, without first changing its attitude towards such conduct, and notifying him thereof. It is due to the company, perhaps, to say that there was substantial evidence to the effect also that this method of securing business—i. e., by entertaining the purchasing agents in such ways—is largely resorted to in the automobile trade, and, further, that, whilst the evidence was to the effect that it was approved by certain of its officers and agents, superior in authority to Norcross and for whose actions it was responsible, the evidence does not trace knowledge thereof home to its president and board of directors. It is probable that it was because the president first became aware of such conduct on the part of Norcross on the occasion of the New York show, and was so shocked thereby that he came to be discharged, though, according to Norcross' uncontradicted testimony, on his return from Muldoon's the president took him to dinner in New York and ordered champagne, as he had done at other times, when entertaining him at

luncheons or dinners in that city. It is clear, therefore, that the company was not entitled to the peremptory instruction on this ground.

The misconduct mainly, if not solely, relied on and set forth in the amended answer was of a different character. It had to do with a $1,000 fund placed in his hands as manager of the Cleveland warehouse to meet its expenses. He was informed of its establishment and of his appointment as manager thereof by letter of July 5, 1907, inclosing a check for $1,000, payable to his order as manager. By the letter he was directed to open an account in a certain Cleveland bank in the name of "the Carpenter Steel Company, by George B. Norcross, Manager," and to deposit to the credit of the account remittances from it and such payments as he might receive in actual currency from customers, to use the funds placed at his disposal "to pay the expenses of conducting the warehouse," and to render a monthly account in such form as might thereafter be prescribed by the accounting department. He so deposited the check and subsequent remittances. There seem to have been no currency payments by customers. He made payments on account of warehouse expenses and rendered monthly accounts down to and including January 1, 1910. These accounts showed the remittances and warehouse expenses during the month, and gave the balance after deducting the latter from the former, which was always termed "balance on hand." Shortly after the receipt of each account, almost always on the 10th of the month, the company remitted to him the amount of the expenses of the preceding month, which, added to the balance reported on hand, would bring the amount up to $1,000. The misconduct complained of in relation to this fund was that he at times used portions thereof for his own benefit in paying life insurance premiums, and otherwise, and out of it made advances to employés under him and to customers and made no report of such use and advances. It followed from this, it is claimed, that he was guilty of insubordination, embezzlement, and untruthfulness. The insubordination consisted in not adhering to the direction contained in the letter of July 7, 1907, establishing the warehouse and creating the fund; the embezzlement, in appropriating portions thereof to his own and others' uses; and the untruthfulness, in stating that he had certain balances on hand which he did not in fact have.

In valuing this conduct—determining the effect to be given to it several things are to be taken into consideration. Norcross' position was one of high grade, and much was left to his discretion and judgment. He was but slightly hampered by directions. That contained in the letter of July 5, 1907, is the only direction which the record discloses that was ever given to him during the course of his employment. In the case of Park Bros. & Co., Ltd., v. Bushnell, 60 Fed. 583, 9 C. C. A. 138, it was held that misconduct which would justify the discharge of a mere clerk or workman might not justify the discharge of a servant of a much higher grade. The letter contained no express prohibition against the use of the fund for any other purpose than paying the expenses of conducting the warehouse. The amount provided for that purpose, to wit, $1,000, was nearly twice as much as was

really needed; and, notwithstanding his monthly reports showed this, no diminution of the fund ever took place. In only one of the thirty months in which it was in existence did the monthly expenses exceed $500, and that month the excess was only $21.35. In only six other months did they exceed $400, and frequently they did not exceed $300. In his answer to that letter acknowledging receipt of the $1,000, dated July 8, 1907, seemingly he rose above it and made himself the judge as to its wishes as to the disposition of the fund. He did not say that he would follow the directions contained therein, but expressed himself thus: "I think I know exactly how you wish this matter handled and will be governed accordingly." This passed unnoticed. During the 30 months, on 14 different occasions, he restored moneys to the fund, amounting in all to the sum of $1,163. At all times the company was indebted to him on account of salary and personal expenses incurred by him in its service in excess of what he used for his own benefit. At least it does not appear that it was not, and it is more probable that it was. Indeed, it cannot be said under the evidence that the company's running indebtedness to him did not exceed both what he used himself and what he advanced to customers and employés. He looked upon what he used out of this fund as advances to himself, similar to advances to customers and employés, and regarded himself as personally bound for the latter as well as the former. It cannot, therefore, be said that there was the slightest danger of the company's losing anything by the appropriation of portions of this fund, in the manner stated, to the use of himself and those others. The considerations thus far alluded to make certain that Norcross had no wicked intent to deprive the company of one cent of the fund thus intrusted to his care. If it were otherwise uncertain, it is made certain by the consideration that he claimed no credit for payment on account of the warehouse that was not a just one, and was therefore accountable to the company for no greater sum than the balance which he reported as being on hand. Nor can it be said that he had such intent to conceal from the company that he was making such uses of portions of the fund. The fact that they were not entered in the monthly statements may be accounted for by the desire of the company to keep separate the expenses incurred on account of the warehouse. He had been told to put in each month's statement, not only the expenses paid on this account during that month, but those incurred, whether paid or not, so that it might be advised at all times as to the monthly expenses. And though the words "balance on hand" in each report, in a strict sense, meant that so much was either in the bank or in cash, they were his words, and it cannot be said that it was unreasonable for him to think as he did, that they meant no more than that the balance shown was the amount for which he was accountable. According to his testimony he was not conscious of wrongdoing in relation to this fund, in either of the particulars in which his conduct is open to criticism. The company became aware of certain particulars thereof long before the discharge, and of it fully upon his discharge, in settling with him as to this fund, and its atti-

tude towards what it so became aware of is, at least, evidential of the fact that his view of the conduct was not unreasonable. On April 20, 1908, he advanced to an employé under him named Woodworth $155 out of this fund. Subsequently after Woodworth had paid back all of the advance but $90, he was transferred to another territory. Thereupon Norcross spoke of the matter to the company's general manager. His language was that he was "in the hole" to that amount. Clearly the company, thus early, knew from this that Norcross was going beyond the letter of July 5, 1907, in so far as it limited him to using the fund in paying warehouse expenses, and that the statement in his reports of balance on hand did not mean amount in bank or in cash. It made no complaint of his so doing, but, upon his request, collected the balance of $90 for him out of Woodworth's salary.

Again, as already intimated, the accounting department, in prescribing the form of the monthly statement, directed Norcross to take credit for each month's warehouse expenses, whether paid or not. Pursuant to this direction, he frequently so did. The vouchers for such credits were sent in when they were paid and they gave the date of payment thereof. Often the dates of payment so shown would be after the company had remitted that month's expenses and just after they were received by Norcross. To an observant person this would suggest the possibility, if not indicate the fact, that until the receipt of the remittance, notwithstanding the statement as to balance on hand might indicate otherwise, that Norcross did not in fact have enough on hand to meet the credits.

It must be accepted, therefore, that the company knew that Norcross was using the words "balance on hand," not in their strict sense, but in the sense of what he was accountable for, and that he was using this fund for other purposes than paying warehouse expenses, at least, in making advances to employés under him. This it knew whilst these things were transpiring. It made no complaint thereof, and, notwithstanding it, it engaged him for the additional and enlarged term at the increased salary. The only thing which it can be said that it did not then know is that he was making advances of portions of the fund to himself. Thereby, as to the particulars of which it was aware, it condoned the past and authorized him to continue to act as he had done. But its conduct goes further than this: It is evidential that Norcross in the first instance did not do wrong in these particulars in acting as he did. Upon the discharge and the settlement of this account, it became fully aware of his conduct in relation to this fund. It made no complaint thereof at that time, and it was nearly a year before it set it up as a defense. So setting it up was purely an afterthought, and most likely came from counsel rather than from it. Its delay in so doing is likewise evidential of the fact that there was nothing in Norcross' conduct in relation to this fund that was a justification for his discharge. The one thing in his conduct in relation thereto that is most subject to criticism was his advancing portions thereof to himself for his own use. We would not be understood as viewing lightly the use by a servant of funds intrusted to his care by

204 F.—35

its master, for his own purposes, without the latter's knowledge or consent. All we hold is that, under the facts and circumstances of this case, it cannot be said as a matter of law that such use as Norcross made of this warehouse fund for his own benefit justified his discharge. We feel quite sure that the company would not have discharged him because of it if it had become aware of it in the course of his employment. Indeed, it is not unlikely that it would not have directed him to cease so doing. This being so, we certainly ought not, because of it, justify a discharge made on another and untenable ground.

The judgment of the lower court is affirmed.