### E. H. TAYLOR, JR., & SONS v. JULIUS LEVIN CO.

### JULIUS LEVIN CO. v. E. H. TAYLOR, JR., & SONS.

(Circuit Court of Appeals, Sixth Circuit. June 7, 1921.)

Nos. 3487, 3488, 3502.

1. **Principal and agent** ⊂⊃33—**Party held justified in terminating contract as to executory part, but not as to part executed.**

Plaintiff, manufacturer of a well-known brand of whisky, entered into a contract with defendant, a dealer in San Francisco, by which defendant was made distributing agent for the Pacific Coast, with the exclusive right, so far as plaintiff could give it, to sell in California and Nevada; also under the contract defendant bought each year so much of that year's crop of whisky as it was estimated its trade would require, giving its notes therefor, which, with the warehouse receipts attached, were discounted by plaintiff in banks and carried, with renewals, until the whisky could be bottled in bond, when it was bottled and shipped to defendant, which then paid the note and tax. Defendant built up a large trade, and the arrangement was profitable to both parties; but after a number of years defendant was charged with many and serious violations of the internal revenue laws, involving fraud, and its business

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was seized by the collector and held for more than a month, when a settlement was made. At that time plaintiff held whisky from four crops, for which defendant had given its notes. This whisky plaintiff sold to another concern, which it substituted for defendant as its Pacific representative. *Held*, that the contract, so far as related to the whisky for which defendant had given notes, was one of executed sale; that the title to such whisky was vested in defendant, and its sale by plaintiff was a conversion; that the executory part of the contract was one of joint adventure in the nature of an agency; and that the bad repute of defendant, resulting from the widely known charges against it, and also fraud practiced against plaintiff, justified its cancellation by plaintiff.

2. **Principal and agent ☞33—Fraud of agent, though not known to principal at the time, justifies discharge of agent.**

That a principal, at the time of his discharge of an agent, was ignorant of fraud practiced against him by the agent, and did not base the discharge on that ground, does not deprive him of the right to rely on that ground, when the right to discharge is later called in question.

3. **Equity ☞65 (1)—Rule of "clean hands" applicable to counterclaim.**

The rule of "clean hands" is applicable to an independent counterclaim, not related to complainant's cause of action, pleaded by defendant in an equity suit under equity rule 30.

4. **Principal and agent ☞41—Measure of damages for conversion considered.**

Where plaintiff, manufacturer of a particular brand of whisky, on cancellation of a contract giving defendant exclusive agency for sale of that whisky in certain territory, converted a quantity of the whisky in its possession, which it had previously sold to defendant under the contract, and sold the same to another, which it substituted as its agent in the same territory, the profit which defendant could have made if the whisky had been delivered from its sale in competition with the new agent, *held* too uncertain and speculative to be adopted as the measure of damages for the conversion, and, it not appearing that defendant could have bought the same quantity of the same whisky in the market, the difference between the price to defendant and that received by plaintiff *held* the best available measure of damage.

5. **Damages ☞40 (1)—Not measured by speculative profits.**

If profits are inherently too speculative to furnish a measure of damages, the fact that they happen to have materialized before the trial does not change the rule.

Appeals from the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Suit in Equity by E. H. Taylor, Jr., & Sons, a corporation, against the Julius Levin Company. From the decree, both parties appeal. Modified and affirmed.

In 1911, E. H. Taylor, Jr., & Sons, a Kentucky corporation, was a distiller of the brand of whisky known as "Old Taylor." The Julius Levin Company, a California corporation, was a wholesaler of whiskies in the Pacific Coast territory. The parties are hereinafter spoken of respectively as Taylor and Levin, and as if individuals. In January, 1911, the two entered into a contract, largely expressed in letters, but in parts to be inferred from the circumstances and their course of business thereunder. It was to the effect that Levin would undertake the wholesale sale and distribution of Old Taylor in the Pacific Coast territory; that Levin should have the exclusive so-called agency and right of purchase of that whisky in California and Nevada; that the expenses of advertising and promotion of the business should be, to some extent, on joint account; that, with the production of each annual crop of whisky by the distiller, Levin would estimate his future needs. and would

buy from Taylor, at the current agreed price, the estimated amount, paying for the same with his six months notes bearing 6 per cent. interest; that Taylor should carry this whisky in his bonded warehouse until it became of bottling age—i. e., for four years—and would issue a warehouse receipt to be attached to the note as collateral; that during this period Levin should renew his notes every six months and pay interest, and pay insurance and storage charges; that Taylor would indorse these original and renewed notes, and procure them to be discounted and carried in some bank; that at the expiration of the four years, Levin would pay the notes, Taylor would bottle the whisky, and ship it to Levin, and would advance taxes, and give Levin 60 or 90 days credit for the taxes and bottling charges. Under this contract, business was carried on with fair satisfaction to each party, until February, 1917. At that date, Taylor was thus warehousing for Levin, and, of the variously maturing crops, a total of 7,150 barrels, represented by warehouse receipts attached to Levin's current notes, which notes aggregated about $193,000 (this is in addition to some smaller lots hereafter mentioned). For the interest, storage, and insurance items, which had accumulated against these 7,150 barrels, Levin had advanced and paid to Taylor a total of about $27,000. The Pacific Coast business in Old Taylor had grown and was growing very rapidly, and the contract was apparently very valuable to both parties. No term for its existence had been agreed upon, but it was clearly the reasonable implication that it should continue, as to the whisky thus purchased and paid for, until the arrival of the bottling and delivery period upon the last crop purchased.

On February 8, 1917, the San Francisco establishment of Levin was seized by the collector of internal revenue for several alleged violations of the internal revenue laws. It remained closed and in the possession of the collector, and business was practically suspended until about March 9th, at which time Levin succeeded in settling, by compromise, the alleged violations of law, and the establishment was returned, and Levin was in a position to resume business. In the meantime, and by a series of transactions ending March 11, Taylor had definitely decided to sever all relations with Levin, had paid up and taken over all the outstanding Levin paper at the banks, removed the attached warehouse certificates, sold the 7,150 barrels to Sherwood, another wholesaler of San Francisco, taken Sherwood's notes for the purchase price under a similar arrangement, and attached thereto as collateral the warehouse receipts. This Sherwood paper he then discounted in various banks.

Levin consistently refused to acquiesce in this cancellation, but, as each note became due, tendered the interest and a renewal, if it was renewable, and, if it was for whisky then of bottling age, tendered payment in full. All tenders were refused. In August, 1917, Taylor brought, in the court below, an action asking for an accounting for damages suffered through Levin's alleged infringement of Taylor's proprietary trade-mark and label rights in the Pacific territory. Levin appeared in the action and filed a counterclaim, asking general damages for the difference between the contract price and the market price upon each crop purchase at the date when it was to be bottled and delivered, and asking special damages for the destruction of his business. There was a reference to a master who made an elaborate report, covering the whole period down to November, 1919. It was found that there had been no infringement by Levin of any trade-mark or label rights, that Taylor had broken the contract, and that Levin had suffered damages assessed by the master at $183,000, in addition to the $27,000 advances paid by Levin. This report was confirmed by the District Court, and both parties appeal. Levin insists that, upon the facts found by the master, and additional liability clearly appearing, his damages should be assessed at about $960,000; Taylor insists that there should be no recovery, excepting for the $27,000, from the award for which he took no appeal.

Wm. W. Crawford, of Louisville, Ky. (Humphrey, Crawford & Middleton, of Louisville, Ky., and Hazelrigg & Hazelrigg and E. C. O'Rear, all of Frankfort, Ky., on the brief), for plaintiff.

Wm. Marshall Bullitt, of Louisville, Ky. (Leo T. Wolford, of Louisville, Ky., on the brief), for defendant.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] From the beginning of the controversy, Taylor contended that the contract with Levin was substantially one of agency, while Levin has insisted that the relations between them were those of vendor and vendee. It seems to have been thought that one or the other label must be applied, and that, when the contract had been thus classified, the legal rules applicable to the rejected theory would be eliminated from any application. We do not thus view the situation. We are content, so far as concerns the title to the whisky for which notes had been given, to accept and approve the findings below to the effect that this whisky had been set aside, appropriated, and paid for by the giving of the notes, and had become the absolute property of Levin, subject to the pledge evidenced by the warehouse receipts to secure the unpaid purchase price. In this respect, there was no agency; but this covers only part of the contract relations. The sharing of the Levin advertising expenses, the arrangement by which Taylor not only would sell to no one else in the Levin Territory, but would, as far as possible, compel all Eastern purchasers or jobbers of Old Taylor to keep out of it, the plan by which they used their joint credit to finance the deals over a continuing four-year period—all these elements of the arrangement constantly continued to be executory, and, though they did not necessarily evidence an agency in the strict sense of that term, they did show that the parties were engaged in a continuing, executory, joint adventure, to which each was to contribute his share for the common good. While their arrangement should continue, Taylor was to be solely dependent for his entire California and Nevada market upon Levin's good-faith efforts to promote the business, upon his integrity and honesty in their mutual dealings, and upon his continued maintenance of his status, which made him reasonably fit to have the exclusive sale of this article, and which would allow his paper to be discounted by the custom of banks. Levin was dependent upon Taylor, not merely to keep the letter of his contract, but to use the utmost good faith in his efforts to keep Old Taylor out of Levin's territory, as well as to maintain the quality of the article, produce it in quantity to satisfy Levin's reasonable demands, permit no unnecessary obstacles in the joint financing, and to co-operate in the effort to make the business successful. The parties themselves did not hesitate to call their relations an agency. Levin says, in his first letter:

"We take pleasure in advising you that we have this day made arrangements with your Mr. May for assuming the agency of Old Taylor whisky. * * * We discussed with him every phase of the agency question. * * * It is understood that we are to have the exclusive agency for the states of California * * * and Nevada. * * * There are not to be any restrictions placed upon our shipping into * * * Utah, Arizona, Wyoming, Montana, Oregon, and Washington. * * * You are to give them [Eastern jobbers] peremptory orders to refrain from shipping into the territory over which we have exclusive control. * * * You will never regret having placed this agency with us."

It is not material whether the name "agency" be adopted or repudiated, and when we hereafter speak of this exclusive agency, we intend the actual relationship, without regard to strict nomenclature; but we cannot doubt that many acts, on the part of Taylor or Levin, which would have justified the other in ending the relationship if it had been more technically of an exclusively agency character, would also justify the termination of the executory portion of this particular joint relationship, and such termination might leave unaffected their respective rights and remedies as to the portions of the contract, which had been so far executed, that entire repudiation would be inappropriate.

Taylor alleges two substantial grounds as a justification for his refusal to continue with Levin in business. One is that the governmental seizure of Levin's business and the developments in that connection created a situation which destroyed Levin's capacity to be a suitable California exclusive representative for Old Taylor under the contract; the other is that Levin had misrepresented and cheated in the matter of their joint advertising and salesman's account. The conclusions below have been that, whatever the disability of Levin to continue properly to represent and handle Old Taylor, this did not justify Taylor in appropriating Levin's whisky. This is conceded; but the results reached disregard the distinction between what was executed and what was executory.

The circumstances as to the seizure should be more fully stated. The actual offenses charged, as recited in the collector's letter, involve violations of eight different sections, some of them carrying possible penitentiary sentences. Taylor made a prompt visit to Washington, in Levin's behalf, and was informed by the Commissioner that Levin seemed to have committed about every offense on the calendar. The matter received great notoriety in the California newspapers. Interviews were published with the Commissioner that he would make no compromise without the approval of the district attorney, and with the district attorney that he should not approve any present compromise, but intended to obtain indictments and prosecute criminally. Prosecutions were also threatened, and thereafter carried on to conviction, under state laws, for adulteration, misbranding, etc. Not all charges of violating revenue laws imply moral turpitude, nor does guilt always derogate from the financial or business standing of the dealer charged; but these charges cover the keeping of false records and the substitution of goods under false labels and markings. Their nature and the sensational publicity they received justified the conclusion which the collector stated to Taylor's agent, May, and which May at once reported, to the effect that, whether Levin obtained a compromise or not, his reputation and trade prestige "are hopelessly impaired, carrying contagion to you and your goods."

It clearly appears that the Levin seizure made his paper unsatisfactory to the various banks which had discounted it. No bank would wish to renew the paper of a suspended business, even with a satisfactory indorser. Doubtless, their dissatisfaction in this case arose because Taylor hastened to tell them the facts; but we see nothing reprehensible on his part in this conduct. On the contrary, he might well think

that good faith to the banks, which had discounted this paper, required that they should have immediate information as to anything affecting the commercial status of either maker or indorser. At any rate, it was clear that, if the suspension of business was to continue, the paper could not be renewed and carried. On February 28, Taylor wired that paper was maturing,[1] and, to be renewed, must have a new maker of satisfactory commercial standing, and asking Levin's intentions. Levin replied by wire that he was arranging to organize a new company with ample capital to take over the account. On the same day, he wrote a letter, which presumptively reached Taylor at a date before the latter irrevocably decided to terminate the agency, though after he had tentatively concluded to do so. At any rate, it reveals the situation about three weeks after the seizure. Extracts are given in the margin.[2] During the latter part of February, Levin stated to May:

[1] From February 2 to February 24, four notes, aggregating $8,278, had matured.

[2] "I am, of necessity, using my father-in-law's stationery, as we are not permitted to enter our offices after the same are locked by the revenue officer. I can assure you that I can hardly find words adequate to express my utmost regret in having placed your company in the present predicament. * * * There is no question but what the collector has made a report black enough to justify him in the drastic action taken against my company. While I admit that I am neither a saint nor a god, nevertheless, my company is innocent of many of the charges preferred against us. * * * Our business increased with such leaps and bounds that it was utterly impossible for us to give personal attention to every detail of our business, and we allowed the bulk goods department to remain under the exclusive supervision of [an employee], in whom we had implicit confidence. * * * The fact of the matter is, I have not checked up the revenue book in the past three years. * * * However, while there have been violations of the regulations of the department, nevertheless we are not entitled to any such treatment as we have received at the hands of the collector. We repeat, there is not a single firm in the United States that has ever encountered such a misfortune for the same violations. * * * In what proved to be the most important details of our business, we were negligent. While the writer feels very much down in the mouth and worried and unnerved, nevertheless he feels that the E. H. Taylor, Jr., & Sons would much prefer to remain in the hands of the Levin boys than make arrangements elsewhere. I infer this, from the loyalty you have displayed in making your fight in Washington in our behalf. * * * We moreover hope that this matter will be settled by compromise within the next four or five days. If, on the other hand, it is turned over to the United States marshal, we have arrangements for bonds to the extent of $200,000, which, of course, will mean indictment. * * * At present, our ideas for the future are to reorganize under another name—probably the Great Western Liquor Company, or something of that order—and liquidate the Julius Levin Company. * * * This would place us in position whereby we could pay cash for all bottling charges and taxes and pay about $150,000 on the goods that you are carrying for us. * * * Our ideas for the future are to handle your account exclusively * * * and direct our efforts solely to furthering your interests. * * * While the writer admits his carelessness, won't you take into consideration our past honesty, loyalty, and integrity to your company? * * * We understand from Mr. May that there are other of our notes falling due which you are not in position to discount. We fully realize the predicament in which you have been placed, and we hope that you will do everything that you possibly can to hold these matters off for at least another 10 or 15 days, by which time we hope to be in position to arrange matters satisfactorily."

"I hope Taylor will treat me right, and all I ask of Taylor is to pay me the interest on [my interest in?] the goods that they are carrying for me, and if I get this amount, I am satisfied, and I am going in the automobile tire business."

Taylor had the right to act upon the situation as it reasonably appeared to him early in March. The future good of the business in Old Taylor, in California and the Pacific territory, was of dominating importance to him. Whether Levin would spend the next year or two in his own office or in the penitentiary was matter of doubt. At the best, his reputation for honesty and reliability had suffered such an injury (by his own fault) that he recognized the impossibility of pursuing the business in the old way and was planning to adopt a new name. His paper could no longer be discounted, unless the situation should change.

In our judgment and for the reasons we have stated, Taylor was amply justified in deciding not to continue the "exclusive agency," but to wind it up (Carpenter Co. v. Norcross, C. C. A. 6, 204 Fed. 537, 540, 123 C. C. A. 63, Ann. Cas. 1916A, 1035); but the exclusive agency was the heart of the matter. The parties would not have contracted to give and to carry the paper for a period of years, and to bottle and ship and to receive at the end of the periods, except as collateral to the exclusive representation. This is obvious enough; as Levin said in his first letter:

"The most important feature of this entire transaction is that we have your assurance that you will instruct the above-mentioned eastern jobbers not to ship any Taylor into our section."

If Taylor, after terminating the exclusive agency, had bottled and tendered to Levin one of the maturing crops, and upon a falling market, Levin would have been prompt to refuse to take and pay for the goods, upon the ground that his exclusive agency was essential; and he would have been plainly right. This illustrates that the right to the exclusive agency and the right and duty to bottle and deliver at the stated future periods are indissoluble; and it follows that Taylor was justified in terminating all executory parts of the contract.

If there were doubt about this conclusion, it would be removed by another consideration. As a part of the general relationship, Levin employed one Pratt as a traveling salesman, to push the sales of Old Taylor, and it was agreed that Taylor would pay one-half his actual salary and expenses. For a period of about two years, Taylor paid every month Levin's bill rendered, in which Pratt's salary and expenses were deliberately padded, so that, during this period, Levin thereby defrauded Taylor out of about $2,300, in addition to some other sums of a similar character. It is true that this fraudulent conduct ceased, so far as the record shows, about 1915, and it is true that the amount involved is small in comparison with the damages here claimed; but the fact of its existence was never discovered until the taking of proofs in this case, and fraud does not become condoned while it is being successfully concealed, nor is the fact that Levin's dishonesty profited him only $2,000 or $3,000 controlling.[3] This sum is not negligible.

---

[3] It throws light on Levin's real fitness to be trusted with the reputation of Old Taylor in his territory to contrast this now conceded fraud with

[2] If this fraud had been known to Taylor in March, 1917, and had been stated as a ground of his action in terminating the exclusive agency, his right to do so would hardly be questioned; and it was held in this court, as we now hold again, that the principal's ignorance of such misconduct, and failure to allege it at the time of discharge as a ground thereof, do not bar him from relying thereon as a sufficient ground, when the right to discharge is later called in question. Carpenter Co. v. Norcross, supra, 204 Fed. at page 539, 123 C. C. A. 63, Ann. Cas. 1916A, 1035. In the present contract, as to its executory portions, the continuing dependence of each upon the integrity and faithfulness of the other necessarily subjects it to the same rules in the respect now under consideration as are applied to strict contracts of agency.

[3] The matter of these false salary and expense accounts has still another aspect. It is difficult to regard Levin's hands as sufficiently clean to entitle him to receive the aid of a court of equity. Levin's counterclaim stood upon a cause of action quite independent from the trade-mark infringement which was the subject-matter of Taylor's bill, and could only have been permitted by way of a counterclaim in the same suit, by virtue of the enlargement given by equity rule 30 (201 Fed. v, 118 C. C. A. v). As to such a counterclaim, the defendant is the actor, who comes into court and asks the affirmative aid of equity, and we have no doubt that the rule of "clean hands" applies to him. We are inclined to think, also, that under the rule of remoteness, as it has been applied by this court (Cleveland-Cliffs v. Arctic, 261 Fed. 15, 23, 31, 171 C. C. A. 611), Levin's fraudulent accounts are closely enough connected with his demand in this case for an accounting so that they should bar the demand; but it is not necessary to decide this question. Certainly the fact that the overreaching can be compensated in damages, and that such compensation has been made by the decree below, does not prevent a court of equity from protecting itself by the clean-hands rule. Cleveland-Cliffs v. Arctic, supra, 261 Fed. at page 24, 171 C. C. A. 611.

[4] The justifiable cancellation by Taylor of the executory portions of the contract could not affect the title to the whisky, which Levin had bought, and the unpaid price of which was covered by his notes. Taylor's action was an unlawful conversion of this whisky. The ordinary measure of damages would be the difference between the contract price and the market price, at which Levin could have bought upon the market the same quantity of the same material; but since it is, to say the least, improbable that he could have procured this amount of this material elsewhere upon the same terms and conditions, and at least doubtful whether he could have procured it elsewhere promptly even for cash, Levin urges, and the master and the court below found, that he ought to recover those profits which he might have made. The propriety of assessing such profits as a measure of damages might well be

Levin's protestations in his letter of February 28: "Not one of our transactions with you were in the least degree shady. The writer can conscientiously state that we have never taken advantage of you to the extent of a five-cent piece; * * * our past honesty, integrity, and loyalty to your company."

conceded in some cases of this general class; but the conclusion which we have reached, as to Taylor's right to terminate the exclusive agency, makes such an assessment inappropriate here.

In the case of an ordinary commodity, lost profits may often be computed with a minimum of uncertainty; but here the exclusive representation in the Levin territory was at the base of the business which he had built up and which he would have carried on. As it turned out, some one else would have been thereafter the accredited representative of Old Taylor in the Levin territory. He would have been, practically, in competition with the hostile manufacturer of his brand, controlling the source. Inasmuch as he could not supply whisky of a later manufacturing date than 1912, his business would gradually run out and with a constantly increasing percentage of overhead. All these elements of the situation, added to the unexampled uncertainty as to effect of the then anticipated prohibitory and tax legislation, raise to the maximum the speculative features of an assessment of lost profits. We are not aware of any well-considered case where lost profits have been recovered under such conditions, and we think they bring the case within the rule forbidding speculative damages. Allis v. McLean, 48 Mich. 428, 12 N. W. 640; Howard v. Stillwell Co., 139 U. S. 199, 206, 11 Sup. Ct. 500, 35 L. Ed. 147; Anvil Co. v. Humble, 153 U. S. 540, 549, 14 Sup. Ct. 876, 38 L. Ed. 814; Eckington Co. v. McDevitt, 191 U. S. 103, 112–114, 24 Sup. Ct. 36, 48 L. Ed. 112; Howard Co. v. Wells (C. C. A. 6) 176 Fed. 512, 516, 100 C. C. A. 70; Hollweg v. Schaefer Co. (C. C. A. 6) 197 Fed. 689, 701, 117 C. C. A. 83; Chicago Co. v. Tiernan (C. C. A. 8) 263 Fed. 325, 339.

[5] It is true that the value of this whisky did thereafter continue to increase, and that Sherwood, who bought it from Taylor, and Taylor, who thereafter repurchased part of it from Sherwood, made large profits; but this cannot affect the measure of damages. If profits are inherently too speculative for recovery, the fact that they happen to have materialized before the trial does not change the rule, although such materialization may be satisfactory evidence of their amount in cases where the law will undertake their computation. It might as well be urged that, if the wisdom of later years demonstrated that there would have been a loss, Taylor should be excused from paying the damages fixed by the market price measure. Indeed, when we observe, in retrospect, the three years following March, 1917, and note the prohibitory laws which took effect during that period, first in some states, and then nationally by war-time prohibition, and by constitutional prohibition, it is apparent that the inquiry whether any profits, and, if so, what amount of them, would have been realized during that period by a dealer who faithfully observed all the laws and regulations, state and national, is as purely conjectural and as highly speculative as any inquiry could well be.

To undertake to compare the contract price with the value which the property would have had to the vendee for his purposes is only to come again to the question of the profits which the vendee might have made, and no criterion of damages remains, excepting the price at which the property might have been bought or sold by or to others. It is clear

that this property was worth more accompanied by an exclusive contract and a carrying contract such as the parties had together than it would have been to buy or sell on the market for cash, and to be devoted to sale in unrestricted competition. The benefit of every doubt is, therefore, given to Levin when we take, as the established market price for which Taylor should account, the sum for which Taylor was able to and did, at about the same time, sell the same goods, accompanied by practically the same carrying and exclusive features. There is every presumption that Taylor obtained the highest available price under these conditions, and there is no satisfactory evidence to the contrary. This difference was, as found by the master, about $72,000, and for this amount we think Taylor liable to Levin.

This is, practically, a recovery as if at law for a conversion. There would be no jurisdiction in equity to award it, excepting for the fact that the equity jurisdiction was properly invoked, and, in such a case, the court may deny the equitable relief sought and give purely legal relief. Howard v. Leete (C. C. A. 6) 257 Fed. 919, 922, 923, 169 C. C. A. 68. This same conclusion makes the rule of clean hands, even if it were otherwise applicable, ineffective to prevent this particular recovery by Levin; and since it is not in any fair sense part of a general accounting, but is rather in the nature of an independent recovery of damages, we think the amount named should bear interest at the legal rate in Kentucky from the 11th day of March, 1917.

We do not overlook that the $72,000 covers all the appreciation in the market price which had accrued, and it may well be that such appreciation includes, among its elements, the accrued carrying charges, and hence that recovery of the $27,000 as well as the $72,000 is, pro tanto, a double recovery. We pass this query without decision, because there has been no appeal from the award of the $27,000; and while it would doubtless be open to us to diminish the $72,000 recovery to meet this objection, if the objection should turn out to be well founded, yet we feel justified in interpreting the briefs of Taylor's counsel as a concession that, if the title had passed to Levin, so that he is entitled to recover as for a conversion, $72,000 is the right amount. Levin claims a considerably larger sum, even on this theory.

Fifteen barrels, which had been paid for in full by Levin, were never shipped to him. During the taking of proofs, Taylor, admitting his liability, tendered warehouse receipts, which Levin refused. For any reason which appears by this record, the tender should have been accepted. Taylor might, at his option, have continued to store these 15 barrels, treating them as the property of Levin, or might have sold them and held the proceeds for Levin. Under the circumstances, this option may be considered as continuing, and, upon settlement of the final decree, Taylor may, as he prefers, turn over these or equivalent certificates for 15 barrels, subject to storage and insurance charges since the tender, or pay the market value at the date of tender and without interest.

Just before and just after the seizure of Levin's business, Taylor had, at Levin's request, bought from other holders 425 barrels in order to meet Levin's needs for certain maturities; but shipment had not been

made, and Levin had not given notes or made any other payment. The record justifies the conclusion that the purchases were made by Taylor as agent for Levin, and the title was in Levin, subject to Taylor's lien for the advanced purchase price. These barrels were included in the sale to Sherwood by Taylor, and were therefore converted. Using the Sherwood buying price as the market price, the damages were $262.34; and this amount should be allowed, with interest from March 11, 1917.

There is no such resemblance between Taylor's trade-marked label and the one later adopted by Levin for another brand as to constitute unfair competition. Schlitz Co. v. Houston Co., 250 U. S. 28, 39 Sup. Ct. 401, 63 L. Ed. 822.

The decree below should be modified, so as to permit only the recoveries indicated by this opinion, and in other respects be affirmed. For the purpose of such modification, and the entry of a new decree and further proceedings in accordance therewith, the record is remanded. Neither party will recover any costs in this court.