## BROWN et al. v. DUPUY.

## O–SO–EZY PRODUCTS CO. v. SAME.

(Circuit Court of Appeals, Seventh Circuit. December 11, 1924.)

Nos. 3452 and 3453.

1. **Master and servant ⬅30(4)—Acts of employé prejudicial to employer warrant discharge.**

An employé owes the duty of fidelity to his employment, and any conduct of his which is prejudicial or likely to be prejudicial to his employer is misconduct which warrants his discharge.

2. **Master and servant ⬅30(4)—Discharge of employé for misconduct held justified.**

Complainant was employed by the owner of defendant corporation as its general sales manager for a term of 10 years, to commence on a fixed date. After such employment, and after the time when it was to commence, but before the formal contract with the corporation was executed, he engaged with others in a plan to organize another corporation to engage in business in competition with that of defendant, subscribed for its stock, and solicited others to do so. *Held*, that such conduct, when it became known to defendant, warranted his discharge.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by Charles Dupuy against J. Rice Brown and others and against the O-So-Ezy Products Company. Decrees for complainant, and defendants appeal. Reversed, with instructions to dismiss.

Joseph B. Lawler, of Chicago, Ill., for appellants.

J. A. McKeever, of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. This appeal is to reverse a decree for $16,000 awarded appellee for damages because of a wrongful discharge.

As early as January 2, 1917, appellee, who for six years had been a salesman for the Channell Chemical Company, a manufactur-

er of floor polishing mops, was hired by appellant Channell for a period of ten years from January 1, 1917, as sales manager for a concern owned by Channell, the O-So-Ezy Products Company, a Michigan corporation. Channell made a memorandum, which he handed to appellant Brown, president of that corporation and Channell's representative, telling Brown to make a written contract with appellee. Channell left Chicago on January 8th and did not return until two or three days before appellee's discharge on February 20, 1917. Brown on the 6th, 11th, and 16th of January submitted drafts of a contract to appellee, and that of the 16th was executed on that date. In addition to the provisions of the contract, Channell had agreed that appellee should be vice president of the company and he was elected vice president of the O-So-Ezy Products Company of Illinois, which had taken over the business of the Michigan corporation.

So far as here material, the contract, following Channell's agreement, provided:

"First. The party of the first part hereby employs the party of the second part as general sales manager and the party of the second part does hereby accept such employment of general sales manager, with full power and authority of employment and discharge of selling force.

"Second. The party of the second part hereby agrees to devote his entire time, attention, and abilities to his duties as sales manager, and to the sales of the products of the party of the first part, and to that end shall travel in such domestic territory or foreign countries as the party of the first part may prescribe from time to time for the purpose of increasing sales of products of party of the first part.

\* \* \* \* \*

"Eighth. It is understood and agreed that this contract shall commence as of January 1, 1917."

During Channell's absence, investigation was made of rumors that pointed to appellee as the organizer of a competing mop concern, and on the afternoon of the day of appellee's election as vice president, Channell, who seems to have gone to New York and back between that date and the date of his return from abroad, called appellee into his office, and, in appellee's language, charged him with a conspiracy to ruin his (Channell's) business and demanded a surrender of the contract.

The substance of appellee's admissions as to what he had done is that on January 7, 1917, he attended a meeting, at which were present Scheinfeldt, Henning, Perkins, and Peter Brown, all employees of the Channell Chemical Company; that they discussed the merits of an oil Henning had brought from New York; "we thought a company might be formed to manufacture that cotton oil and manufacture mops and polishes;" that was the same business that the O-So-Ezy Products Company and the Channell Chemical Company were in; that on January 10th he subscribed for $2,000 stock; that he had a meeting, with the same men, in regard to the formation of a company other than that for which he worked; he admitted seeing Exhibit 1, a proposed product carton with the word "Du-Shine" on it, for the new concern. He was present at another meeting on January 11, 1916. He said he asked Hahn, sales manager of the Channell Chemical Company, to take stock in the new corporation. Channell testified that appellee told him that "the only reason I went to these meetings and discussed it with the other men was so that I would have information that I could come to you with and let you know who your employés were *who were working to disrupt your business.*" Appellee has in no way denied that statement.

[1] The foregoing evidence is wholly uncontroverted, but appellee says that was all done before the written contract was signed, and it is urged that he had the right to do what he did because he did not know whether the contract would be signed. There is also in the record the testimony of four witnesses, having no more interest than appellee, that contradicts appellee on material points. That testimony shows that appellee was the moving factor in the proposed new competing concern; that he said "Du-Shine" was a combination of part of his name and part of Scheinfeldt's; that he asked others besides Hahn to subscribe for stock; and that he continued the efforts toward organization long after the contract was signed. Leaving, then, wholly out of consideration the evidence on controverted points, as to which we think the preponderance is very much against appellee, the question is: Did appellee's conduct, as shown by the uncontroverted evidence, justify his discharge?

2 Williston on Contracts, § 1022, p. 1923, lays down the rule that: "The duty of fidelity to his employment imposes on the employee not simply the positive duty of reasonably skillful performance of the work intrusted to him, but the negative duty of refraining from deception, and from entering into relations giving him an interest inconsistent with that of the employer. Thus

deceptive and fraudulent statements or conduct not only renders the employé liable, but justifies his discharge."

In Carpenter Steel Co. v. Norcross, 204 F. 537, 123 C. C. A. 63, Ann. Cas. 1916A, 1035, the court said: "They [the authorities] lay down that the general rule is that misconduct, to justify a discharge, must be misconduct in the service, and that, in order to justify a discharge on the ground of misconduct prior to service, the servant must have been guilty of a 'moral fraud' in concealing it from the master when entering into the service. Wood, Master and Servant, p. 212."

Again: "It is now well settled that any conduct which is prejudicial or likely to be prejudicial, or injures or has a tendency to injure, the master, is misconduct that warrants a discharge. 20 A. & E. Enc. of Law, p. 27; 26 Cyc. pp. 988, 990. In Wood, Master and Servant, p. 208, the law is stated thus: 'Misconduct prejudicial to the master's interests, although not exhibiting moral turpitude, is a good cause for the discharge of a servant. And conduct exhibiting moral turpitude, although productive of no damage to the master's interests, is a good ground for terminating the contract. * * * '"

[2] Appellee's defense of his conduct, namely, that what he did was *before* he signed the written contract, seems rather an admission that had it happened *after* the signature it would have been reprehensible. His claim to Channell that his participation in the meeting with other Channell employés was so "that I could come to you and let you know who your employés were *who were working to disrupt your business*" can only be understood as meaning that he knew that the result, if not the purpose, of what was being done at those meetings, tended to disrupt the Channell business. Appellee's position was one of great confidence and trust. Channell told him the contract would give him the right to run the sales in his own way, and the contract made him "general sales manager, with full power and authority of employment and discharge of selling force." There could be no broader powers and no greater opportunity to injure Channell's interests by the slightest bad faith or disloyalty.

We are of opinion that appellee was guilty of such bad faith and disloyalty towards the Channell interests as justified his discharge, whether what he did was before or after the contract was signed. His testimony shows: "From December, 1916, to January 16, 1917 [date contract was signed], I received two

4 F.(2d)—24

or three checks from the O-So-Ezy Products Company, the Michigan corporation, and prior to the 1st of January, 1917, I received checks from the Channell Chemical Company." The written contract covered his services from January 1, 1917, so that he was actually in the employ and pay of the Michigan corporation while he was giving his time to the organization of the opposition company.

We think the trial court misconceived the effect of the letter of March 5, 1917, when it found that the letter treated the contract as in effect, after all the misconduct was known. The letter is before us. It says: "We answered your telegram March 3d as follows: 'Can send check only on surrender of contract broken by you.'" That clearly indicates that they were then claiming that he still held a contract that he had violated and that they claimed he should surrender. The whole letter simply shows that Brown and Channell had been trying to find some basis of adjustment, but that *further* developments led them to conclude it could not be done and that he should acquiesce in his discharge. Channell denies that he ever told appellee to go back to work after he knew the facts.

The decree is reversed, with instructions to dismiss the bill.