### MAYS *v.* BARNETT.

#### Opinion delivered November 14, 1921.

1. EVIDENCE—AMBIGUOUS CONTRACT—PAROL EVIDENCE.—While parol testimony cannot be received to vary the terms of a written contract, it may be considered to show the relative situation of the parties in determining the meaning of an ambiguous written contract.

2. EVIDENCE—PAROL EVIDENCE TO EXPLAIN AMBIGUITY.—Where a bill of sale described the property sold as "all electric light poles on streets and alleys of Leslie, Ark., and all wire and electric light fixtures on and between said poles (including all transformers, street light fixtures," etc.), it was not error to admit parol and extrinsic evidence to show that the sale by the term "light fixtures" included a street light serial and switch board, though they were not on or between the poles.

Appeal from Searcy Chancery Court; *B. F. Mc-Mahan,* Chancellor; affirmed.

*W. F. Reeves* and *Carmichael & Brooks,* for appellant.

The parties are bound by the written contract. All previous conversations and understandings merged into and became a part of the written contract and can not be varied by parol testimony. 99 Ark. 218; 93 Ark. 371; 133 Ark. 112; 120 Ark. 368; 135 Ark. 38.

The finding of the chancellor is not supported by the evidence.

The contract is plain and needs no parol testimony for the purpose of explaining it. The words in parenthesis simply meant to limit the fixtures and transformers to those in use at the poles, between the poles and within the corporate limits. A "parenthesis" is defined to be an explanatory or qualifying clause, sentence or paragraph * * * without being grammatically connected there-

with." 53 Fed. 81; 3 C. C. A. 440; Words & Phrases, Vol. 6, 5174. Should the parenthetical clause in the bill of sale be treated as a general clause after a particular description, see Elliott on Contracts, Vol. 5, § 4791, for the effect thereof.

Since the cases were consolidated and the chancellor was in error on the main question, the whole case should be reversed.

*S. W. Woods,* for appellee.

The contract is ambiguous and required parol testimony to explain it. 90 Ark. 272; 93 Ark. 191; 94 Ark. 195. The testimony given does not vary but explains the contract. 97 Ark. 522; 105 Ark. 518. Parol testimony is admissible, however, to add to a written contract some provision, where the writing, on account of fraud or mistake, does not contain all of the contract. 78 Ark. 586; 88 Ark. 383; 94 Ark. 195; 94 Ark. 575.

Smith, J. Appellee Barnett instituted two suits against appellant Mays (who was doing business under the name of Mays Manufacturing Company and will be hereinafter referred to as Mays), which were consolidated and tried as a single suit. The first was a suit in replevin for a street light serial and a switch board of the value of $345. The second suit was one to recover the value of certain electric light poles and certain fixtures, tools, and other appliances which had been used in connection with the electric light plant in the city of Leslie, Arkansas, which Barnett claimed he had bought from Mays, but which Mays had refused to deliver. The value of the articles thus sued for was alleged to be $205, and, in addition, judgment was prayed for in the sum of $154.30, for advances on meters furnished by Mays to patrons of the light plant during the time Mays ran it. The facts in regard to the advances on the meters need not be stated, as liability for this item was not denied. The answer filed denied Barnett's ownership of the property sued for, and alleged the fact to be that Barnett had wrongfully taken

possession of certain fixtures, and judgment for the value thereof was prayed, with damages for their usable value.

The decree was in favor of Barnett on all the issues raised except that the court gave judgment against him for $95, this being the value of certain meters taken from the warehouse of Mays and which the court found were the property of Mays, and there has been no cross-appeal by Barnett from that finding.

The main controversy in the case is over what is called the street light serial and switch board, and what we shall say in regard to these two articles will be decisive of the ownership of the other articles sued for.

On July 23, 1920, Mays sold to Barnett the electric light plant in the city of Leslie, and executed a bill of sale therefor, which reads as follows:

### "BILL OF SALE.

"This bill of sale, made on the 23rd day of July, A. D., 1920, by and between Ed Mays (Mays Mfg. Co.) of Leslie, Arkansas, as grantor, and A. L. Barnett, of Leslie, Arkansas, as grantee.

"Witnesseth, that the said grantor, in consideration of the sum of $4,000 to me paid, the receipt of which is hereby acknowledged, does hereby sell, assign, transfer, set over and deliver unto the said grantee the following described personal property, to wit: all electric light poles on streets and alleys of Leslie, Ark., and all wire and electric light fixtures on and between said poles (including all transformers, street light fixtures), and in addition thereto all meters that are in resident and business houses in Leslie, Ark. I am selling the meters outright and agree to make proper adjustments or refunds to customers.

"To have and to hold said personal property unto said grantee and unto his heirs, executors, administrators and assigns forever. The said grantor covenants that said property is free from incumbrance, and that

he has the lawful right to sell and dispose of the same; and that he will warrant and defend the title thereto against all claims whomsoever.

"In witness whereof, I have hereunto set my hand and seal this the 23rd day of July, 1920.

"MAYS MFG. CO.,

"By Ed Mays,

"ED. MAYS."

Barnett contends that the property sued for was conveyed by this instrument; but this is denied by Mays; and the decision of the point in controversy depends on the construction given this instrument.

It is the contention of Mays that the bill of sale is plain and unambiguous, and that it would offend against the rule which makes parol testimony inadmissible to contradict or vary the terms of a valid written instrument to admit or consider testimony in explanation of this contract.

The portion of the bill of sale said to be ambiguous is the phrase, "including all transformers, street light fixtures" included within the parentheses. It is the contention of Mays that this phrase is one of explanation, and does not enlarge the conveyance, and was intended to limit the fixtures and transformers conveyed to those in use at the poles, between the poles, and within the corporate limits of the city of Leslie, and that the contract, if properly construed, would read: "All electric light poles on streets and alleys of Leslie, Arkansas, and all wire and electric light fixtures on and between said poles, including all transformers and street light fixtures between said poles." If the contract were so construed, Barnett cannot recover in this action.

But we are by no means certain that this is the necessary or proper construction of the language in question. Upon the contrary, we have concluded that the phrase quoted is an ambiguous one, and that the court below properly admitted and considered parol

testimony showing the relative situation of the parties in determining the meaning of that phrase.

The rule in such cases is clearly stated in the case of *Boden* v. *Maher*, 105 Wis. 539; 81 N. W. 661; 32 L. R. A. (N. S.) 389, from which we quoted in the case of *Brown & Hackney* v. *Daubs*, 139 Ark. 53, as follows: "Parol evidence to vary the terms of a written contract is one thing; such evidence to enable the court to say what the parties to a contract intended to express by the language adopted in making it is quite another thing. The former is not permissible. \* \* \* . The latter is permissible, and is often absolutely essential to show the real nature of the agreement. \* \* \* Both rules are elementary, and do not conflict in the slightest degree with each other. One prevents a written contract from being varied by parol evidence, either in regard to what was said at the time it was made or prior thereto; the other aids in determining what the contract is when its language, either in its literal sense or as applied to the fact, is obscure. The one is a rule to preserve the contract as expressed in writing; the other is a rule of construction to determine what the contract, as expressed, is, it being kept in mind that the mutual intention of the parties, so far as the same can be ascertained, governs within the reasonable meaning of the language they chose to express it; and that rules of construction to discover it are not to be resorted to unless there is some ambiguity to be cleared up. A failure to keep in mind the wide distinction between varying a contract by parol evidence and resorting to such evidence in aid of its construction often leads to error." See, also, *Stoops* v. *Bank of Brinkley*, 146 Ark. 127; *N. Y. Life Ins. Co.* v. *Allen*, 143 Ark. 143; *Ellege* v. *Henderson*, 142 Ark. 421; *Goodwin* v. *Baker*, 129 Ark. 513; *Livingston* v. *Pugsley*, 124 Ark. 432; *Arlington Hotel Co.* v. *Rector*, 124 Ark. 90; *Wood* v. *Kelsey*, 90 Ark. 272.

Applying this rule in the interpretation of the language of this contract, we find the following facts established by the testimony.

Mays had operated a light plant in the city of Leslie, all of which was owned by him except a dynamo, but had ceased to operate the plant, and his franchise had been declared forfeited both by the city council and the State Corporation Commission. The city was without lights. Mays owned certain manufacturing plants, and was using the power plant and dynamo and the wires between his roller mill and two other mills known as the Lenker mill and the Perkin mill in the operation of those plants. Mays had no use for the machinery or lighting system except the dynamos and the poles and wires between the manufacturing plants above mentioned, and he had been ordered to remove all poles, wires, and fixtures of every nature from the streets of the city. The citizens of the town were anxious to have the light plant operated, and as a means to that end were endeavoring to induce Barnett to buy it. Two of these citizens, David Cotton and Dr. Fendley, became quite active in promoting that object.

Mays prepared a complete inventory of the light plant, which showed the cost thereof to him to have been $6,951.67. This inventory was submitted to Barnett, who had the same checked over to ascertain whether it constituted a complete lighting system. Upon being advised that it did, he submitted to Mays the following offer in writing:

"Leslie, Ark., July 22, 1920.

"Mays Mfg. Co., Ed Mays, City:

"Dear Sir: After making a survey of your lighting system within the corporate limits of Leslie, and after due consideration of the matter, I have made up my mind that I will give you $4,000 for the entire system covering all the town, that is within the limits of the incorporated city of Leslie, Chandler & Griffin addition included.

"The above offer is for all the poles, wiring, meters, transformers and street lights, etc., and under the conditions that you turn same over to me and agree not to obstruct me in any way in carrying on the business

of a public utility here in the city of Leslie, Arkansas, you to pay consumers back amount they had advanced on meters.

"I feel that the above offer is really more than the system is worth, but the town needs the system in operation immediately, therefore I make you this offer under the conditions as above stated, and this is all that I will give you.

"So please give me an immediate answer, as I desire to know at the earliest possible moment.

"Respectfully submitted,

"A. L. BARNETT."

On the same day Mays made the following reply in writing:

"Leslie, Ark., July 22, 1920.

"Mr. A. L. Barnett, City.

"Dear Sir: Referring to your letter of even date, I will accept $4,000 for our electric light wiring system in Leslie, to include the main part of Leslie, but I reserve that part of the system which I am now using in my manufacturing business, which is the line and poles beginning at our flour mill and runs by way of our Lenker plant to include our Pekin plant. You appreciate the fact, should we sell these poles and wires that we are excluding from the sale, we would not have same under our control any longer, and therefore it might mean the shutting down of our plants. Anyway we need that part of the system which we have excluded from the deal in our manufacturing business. You want to appreciate the fact that we are not in the light business for the public, nor could we engage in the public utility work without a permit from the Corporation Commission, and that we have no intention of ever being in the light business for the public in Leslie any more. You understand that we are selling you all the meters in Leslie that are now being used in our system, and that we are to take care of all refunds to customers. I understand you have checked up this wiring system of ours and fully understand what you are buying.

"If you wish to accept our offer, please advise us to-day, and we will prepare a bill of sale and consummate the deal today.

"Yours very truly,

"MAYS MANUFACTURING COMPANY,

"Per Ed Mays."

The negotiations proceeded no further until Cotton and Fendley became active. These gentlemen were not the agents in fact of either Mays or Barnett, yet in a sense they acted for both parties by carrying the messages between them whereby the deal was finally closed. Barnett was asked who Dr. Fendley represented, and answered, "He came there (to Barnett's place of business) for Mr. Mays. I was going to tell you what he said. Mr. Mays sent him, for he said, 'Mr. Mays wants to know if you will give him $3,800, and let him keep those wires.'" Barnett answered, "No, I won't have anything to do with the plant unless I get it all." This message was immediately communicated to Mays by Cotton and Fendley, who returned in about an hour with the bill of sale. Upon reading it over, Barnett said, "This could have been made a little plainer." But Fendley said he would guaranty that "everything goes now."

Mays testified that when Fendley and Cotton came to him he insisted that a bill of sale be written, so that no controversy would arise over the articles sold, and that he therein specified all that was sold, and that the writing does not include the articles in controversy, because they were not between any of the poles of the system, and, as has been said, this is true if the contract is read as thus limiting the fixtures sold.

Fendley and Cotton both testified that when they reported to Mays that the counter-proposition contained in his letter to Barnett had been rejected by Barnett, and that Barnett would not entertain any proposition except upon the basis stated in his letter to Mays, that Mays finally said, "I'll trade. I'll take it." And when Mays drew up the bill of sale, and when he had finished

it asked, "Is that full enough, or does that cover every-
thing satisfactorily?" they thought it did, and repeat-
ed the conversation to Barnett. Upon delivering the
bill of sale to Barnett, which they did, they received
from Barnett a check for $4,000, which they immediately
delivered to Mays.

We think that, once we have considered the testi-
mony showing the situation of the parties at the time
of the execution of the bill of sale, it clearly appears
that Barnett intended to buy all the property included
in the invoice submitted to him, and that Mays knew
that Barnett so understood the bill of sale, and when
he accepted the check the deal was consummated on
that basis. The street lights could not be operated with-
out the street light serial and switch board, and they
will, therefore, be held to be included in the term,
"street light fixtures," although they were not on or be-
tween the poles.

The court below so found and decreed accordingly,
and, as we concur in that finding, the decree will be af-
firmed.