BYNUM et al. v. JOS. E. SEAGRAM & SONS, Inc., et al.

Civ. No. 1737.

United States District Court, E. D. Arkansas, W. D.

April 5, 1950.

John Baxter, of Dermott, Ark., DuVal L. Purkins, of Warren, Ark., and Longstreet Heiskell, of Memphis, Tenn., for the plaintiffs.

T. M. Galphin, Jr., of Louisville, Ky., and Shields M. Goodwin, of Little Rock, Ark., for defendants.

TRIMBLE, District Judge.

The plaintiffs in this case are Mrs. Lula M. Bynum, her four sons and their wives.

They were the owners and operators of a stave and heading mill at Dermott, Arkansas. The business had been established by Mr. W. B. Bynum, Sr., now deceased, many years ago. The active members of the partnership were W. H. Bynum, W. W. Bynum and W. B. Bynum, Jr., The defendants Joseph E. Seagram & Sons, Inc., and Julius Kessler Distilling Company, Inc., are distillers of whiskey. The H. McKenna, Inc., and Julius Kessler Distilling Co., Inc., were subsidiaries of Jos. E. Seagram & Sons, Inc. McKenna entered into a lease contract with the Bynums, on August 1, 1945, by which the Bynums leased to it the mill property, including tools, land and equipment, for a period of two years.

On the same day McKenna entered into contracts of employment with W. H. Bynum, W. W. Bynum and W. B. Bynum, Jr., by which the Bynums were employed to supervise the operation of the stave and heading mill, and to do other things for McKenna. The contracts fixed their salaries at $9,000, $7,500 and $5,000 per annum respectively.

The lease contract provided for the payment of a fixed monthly rental of $3,000, and in addition to the fixed rental the lessee was to pay additional rentals, based on percentages of production of staves and heading the ratio of percentage increasing as the annual production increased.

The percentages were based on the market price of each month's output, and the contract provided that "the market price for each month's output of manufactured staves and/or headings shall be determined by taking the average price in Louisville, Kentucky, for such staves and/or heading of similar value, and deducting therefrom the cost of transportation of such staves and heading in carload lots from Dermott, Arkansas to Louisville, Kentucky."

The leased mill is equipped to produce bourbon and oil staves and heading, with the usual offal from such manufacture. Bourbon cooperage is made from a superior grade of white oak timber, the oil cooperage being a by-product in making bourbon and also is made from red oak and inferior timbers. The bourbon is used for aging and storing whiskey, while the oil is used in storing oils, fats, greases, condensed milk, etc.

The lease contract of August 1, 1945, prohibited Seagram from operating a stave mill within 100 miles of Dermott. In October, 1945, the Calvert Distilling Company, another subsidiary of Seagram, desired to purchase a stave mill at Pine Bluff, Arkansas, which is within the 100 mile limit. Therefore Seagram desired to eliminate this provision of its lease contract. On October 19, 1945, the lease contract was amended for that purpose. The consideration to the Bynums for such amendment, was the extension of the lease term for three additional years, a total of five years, and the allocation of certain timber to the Dermott mill "on which it could operate."

There was another amendment of this lease contract under date of June 28, 1946, which permitted the Bynums to engage in the production of cooperage on their own account in certain territory, and which reduced the monthly rental to $2,750.00.

A hearing was had on April 15, 1949, and a pretrial order entered by the court, which defined largely the issues to be tried at the hearing on the merits. Since that time it has been stipulated that Joseph E. Seagram & Sons, Inc., and Julius Kessler Distilling Co., Inc., are liable jointly and severally for any amounts finally adjudged to be due the plaintiffs.

Was it the intention of the parties, under the lease contract, that the leased plant should be operated to capacity during the term of the lease? The contentions of the parties, as to this issue, are well expressed in proposed findings of fact, submitted by the defendants:

"Lessors seek to hold Seagram liable in damages for the curtailment of operations of the plant from July 1, 1947 to February, 1948, and for the suspension of operations in February 1948, and prays a decree requiring defendants to operate the plant at its reasonable productive capacity to July 31, 1950, which is the end of the term of the lease, as amended. Lessors contend

that Seagram was obligated to operate the plant at its reasonable productive capacity during the entire five-year term of the lease, as amended, in the making of bourbon staves and heading and oil staves and heading, to the end that they might obtain large addition rentals over and above the fixed monthly rental of $3,000.00 (later reduced to $2,750.00).

"Seagram contends that it was not obligated to operate the Dermott mill at its reasonable capacity or to any extent except to the extent required by the allocation-of-timber provision of the amendment of October 19, 1945, and further contends that the fixed monthly rental which was unconditionally enjoined upon it, whether it operated the mill or not, was inserted in the lease as a substitute for a covenant to operate except to the extent required by the allocation-of-timber provisions of the amendment of October 19, 1945."

◼ The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties, as of the time the contract was made, so far as that may be done without contravention of legal principles, statutes, or public policy. 17 C.J.S., Contracts, p. 689, § 295; Texas Co. v. Kennedy, 190 Ark. 1178, 78 S.W.2d 825; Dewey Portland Cement Co. v. Benton County Lumber Co., 187 Ark. 917, 63 S.W.2d 649; Sternberg v. Snow King Baking Powder Co., 186 Ark. 1161, 57 S.W.2d 1057, 1058; Sydeman Bros. v. Whitlow, 186 Ark. 937, 56 S.W.2d 1020, 1021."

◼ We must look to the whole contract in order to determine its meaning, and ascertain what the parties did under the contract, and how they construed the contract. Sternberg v. Snow King Baking Powder Co., supra, 186 Ark. at page 1166, 57 S.W. 2d at page 1057; Continental Ins. Co. v. Harris, 190 Ark. 1110, 82 S.W.2d 841; Duty v. Keith, 191 Ark. 575, 87 S.W.2d 15; Dodson v. Wade, 193 Ark. 534, 101 S.W. 2d 182.

It might well be noted that the lease contract does not in either specific or general terms require the operation of the leased mill at capacity during the term of the lease. Even taking into consideration the surrounding circumstances under which the contract of lease was made, and the employment contracts and amendments, it does not appear in unequivocal terms that the parties intended to provide for such capacity operation during any particular period or at all.

There is one incident in the conduct of the parties, which stands out with great clarity, and shows how the parties themselves, and particularly the plaintiffs, regarded the contract as to the requirement for capacity operation. On October 19, 1945, within ten weeks of the making of the original lease contract, there was a meeting of the parties, with their counsel, in the city of Memphis, Tennessee, to negotiate an amendment to the lease contract. The testimony on behalf of the defendant, uncontradicted by the plaintiffs, is that during the negotiations the following occurred:

"During the course of the discussion, the Bynums brought up the question of whether we would operate the Dermott plant to the end of the lease, and I said we would not bind ourselves to operate. Mr. Williams remarked that there was nothing in the lease requiring the tenant to operate. I further remarked that so long as we bought timber in the area, part of it would be allocated to the Dermott plant on which they could operate. While we were in this discussion, one of the Bynums asked if we would guarantee operating their plant as long as we operated at Pine Bluff. I said we wouldn't make any promises with everything so uncertain, such as grain restrictions by the government, our own needs, the fact that Pine Bluff would be an owned plant and might have various reasons to operate without operating at Dermott. We might shut down the Pine Bluff plant without shutting down the Dermott plant. The fact that we were working on a plywood barrel might change our need for barrels, and the general uncertainty of what we might produce in our distilleries made such commitment impossible."

This testimony was given by Mr. Galphin, chief counsel for Seagram, and Mr.

Nelson, an administrative employee of Seagram. It appears that these statements were made by Mr. Williams, at that time and now counsel for plaintiffs, and by two of the Bynums, both of whom were present in court at the time the evidence was given. No witness took the stand and contradicted the evidence, therefore it stands unchallenged. Immediately after these statements were alleged to have been made, the Bynums executed an amendment to the lease contract, which repeated the terms of the lease contract, and they did not include in such amendment any provision as to the future operation of the mill, different in kind from the provisions of the original lease contract.

■ This testimony, although objected to by plaintiffs, was admissible. Mays v. Barnett, 150 Ark. 492, 234 S.W. 488; Brown & Hackney v. Daubs, 139 Ark. 53, 213 S.W. 4; Ben F. Lewis Inc. v. Collins, Ark., 219 S.W.2d 762. It was also admissible as an admission or declaration against interest. 31 C.J.S., Evidence, § 270, p. 1022; Pacific Mutual Life Ins. Co. of California v. Butler, 192 Ark. 614, 619, 93 S.W.2d 329.

■ Giving to this evidence the probative force and effect which the court finds should be given, it is clear that Seagram did not obligate itself to operate the mill to its reasonable productive capacity, or to any extent, except to the extent required by the allocation-of-timber provision of the amendment of October 19, 1945, and the monthly rental which was unconditionally enjoined upon Seagram, whether it operated the mill or not, was inserted in the lease as a substitute for a covenant to operate except to the extent required by the allocation-of-timber provision of the Amendment of October 19, 1945.

Are the Bynums entitled to payment of rentals for the timber from the Nants tract, near Gleason, Tennessee? On August 20, 1945, Col. Wilkie, acting for Seagram, wrote a letter to W. W. Bynum, containing this statement:

"With reference to the Tennessee timber in and about 15 or 20 miles of Gleason, Tennessee, while this is not covered by your contract, these things are true: (1) That this contact was peculiarly yours. (2) That the equipment other than motor transportation is being furnished from the leased property, and the supervision will be by the Bynum brothers.

"Therefore it is agreed that a similar contract applies to the Gleason property but the production will not be accumulative with the Dermott manufacture."

Admittedly this letter makes a contract to pay the Bynums for staves and heading manufactured from the Gleason timber. About that defendants make no contention. In their brief defendants say this: "Up to this point there is no disagreement as to the facts in the Gleason matter."

The title to the Gleason tract was not obtained until about November 26, 1945. In January, 1946, the Jackson, Tennessee finishing plant was acquired by Seagram, and Huntley was put in charge of Seagram's Tennessee and Kentucky operations. The first opportunity to cut timber at Gleason, on account of the wet winter months, was about June, 1946. The first notice to the Bynums that they were not to be paid according to the terms of the letter of August 20, 1945, was contained in a letter dated October 15, 1946, signed by Mr. Wellnitz. This letter made no complaint against the manner of proceeding adopted by the Bynums in the matter, nor did it make complaint of their failure to cut the timber before that date. It merely evidences a change in the plans of Seagram for handling this timber. It states: "it is our plan to work the timber from the Nants tract * * * in West Tennessee or Kentucky."

The testimony of the Bynums shows that the delay in cutting the timber was occasioned by Mr. Wellnitz, who told them, in effect, that Seagram was not yet ready to proceed with the cutting of this timber. Mr. Wellnitz's letter of October 15, 1946, removed the Bynums from supervision, and stated that all cutting arrangements would be made with Mr. Huntley.

In this letter there is no intimation that a failure on the part of the Bynums occasioned the change in plans, and, viewing Mr. Wellnitz's whole course of correspond

ence and dealing with the Bynums, if the change of plans had been occasioned by a failure on their part to perform the contract, it is difficult to think that Mr. Wellnitz would not have said so in plain and unequivocal terms, and advised them in plain and concise language that the plans were being changed on account of such failure on their part.

█ I find that the Bynums did not breach the contract to cut and manufacture the Gleason timber, and they are, therefore, entitled to judgment for this item. The details of the recovery will be worked out in the findings of fact, conclusions of law and the decree to be entered herein.

Was Seagram justified in discharging the three Bynums, thereby terminating their employment contracts prior to July 31, 1950, the date of termination fixed in the contract? [1]

Seagram in its brief says: Seagram was abundantly justified in discharging the three Bynum brothers.

"Operations at the Dermott plant were suspended in February, 1948. For the following eight months, Seagram, in accordance with its contracts with Messrs. W. H. Bynum, W. W. Bynum, and W. B. Bynum, Jr., continued them in its employ and paid them * * * (their agreed salaries) * * *. These gentlemen would still be in Seagram's employ but for the fact that they persistently and without good cause declined to comply with a simple directive of Seagram in the 'cull stave' matter. This resulted in Seagram's discharging them as of October 31, 1948."

█ Seagram is mistaken when it says in its brief: "The sole question was one of master and servant; whether Seagram was justified in discharging the Bynums." While under the employment con-

tracts they are denominated "employees" it must be remembered that these three men occupied a dual position. They were also lessors, and representatives not only of themselves but the other members of their family, their co-lessors. As lessors they had a right to look after the interest of the lessors and refuse as employees to do anything against the interest of themselves and those they represented. As is said in Dickinson v. Hart, 142 N.Y. 183, 36 N.E. 801, this agreement created more than a relation of landlord and tenant, it created a business arrangement, and it was for the benefit of both parties.

█ These contracts of employment provided that the duration of the employment should be until July 31, 1950. Under such a contract the master does not have the right to terminate the contract and discharge the employee before the expiration of the time named in the contract, as a matter of whim or for trivial causes. These men occupied executive positions, exercised judgment, discretion, had responsibilities and were experienced capable stave mill operators.

"In such employments as involve a higher order of services and some degree of discretion and judgment, it would seem to be unreasonable to regard employees as subject to the whim and caprice of their employers or as deprived of all right of action to such a degree as to be liable to lose their places upon every omission to obey orders involving no serious consequences. It seems that in the case of employments of this character, a breach of duty is not per se a legal justification for discharge of the employee, unless the breach evidences moral turpitude, or the conduct is manifestly injurious to the employee's business. There must be something more than a conscious failure to obey. If the

1. The incident occasioning the discharge of the three Bynums as supervising employees, was the sale by Seagram, to W. L. Bynum Cooperage Company, of Dermott, Arkansas, a rival cooperage concern of all the cull staves on the yard. Bynums refused to permit the vendee to remove the cull staves, for the reasons: That the sale price of $1,000.00 was inadequate; that there were among the

culls a great number of staves which could be worked up into dog staves and oil staves, which could be sold and on which the lessors would receive additional rentals. It was lessors' contention that the cull staves were worth approximately $10,000.00. The mill had been inoperative, on orders of Seagram for eight months, and the Bynums had been idle practically all that time.

occupation is of such a character that the employee's business interests and reputation will suffer unless he is kept actively engaged in a certain branch of his work for the greater part of his time, it seems that he may refuse to obey an order which has the effect of withdrawing him from that work for a considerable period. The question whether this principle applies in a given case depends on the fact in evidence." 35 Am.Jur. p. 480, Sec. 46.

"According to some decisions the willful disobedience of a lawful order of the master is a good cause of discharge, even though the servant fears that he may be prejudiced by obeying, and even though there has been no resulting loss to the employer, but the view has been taken that, in order to constitute just cause for the discharge of a servant, the disobedience must be with respect to matters of such importance in the conduct of the business as to reasonably require obedience and fulfillment, and that in such employments as involve a higher order of services, and some degree of discretion and judgment, it would be unauthorized and unreasonable to regard skilled mechanics or other employees as subject to the whim and caprice of their employers or as deprived of all right of action to such a degree as to be liable to lose their places on every omission to obey orders involving no serious consequences. So, with respect to insubordination and disobedience as a ground for discharge, it has been stated that an employee holding a position of responsibility requiring the exercise of power is not bound to as strict adherence to directions of superiors as is one in an employment involving the exercise of less responsibility and discretion." 56 C.J.S., Master and Servant, p. 432, § 42-h.

"These instructions told the jury, in substance, that it was the duty of the employee to refrain from acts or conduct of insubordination and the use of disrespectful language towards his employer, and that a violation of such duty would justify his discharge, unless reasonably provoked or brought about by the employer's conduct. This is undoubtedly the correct rule as between master and servant, em-

ployer and employee. Here the employee was not a mere servant or employee, but was a stockholder, director, vice president, and manager of a branch house. He had, to the amount of his stock, the same interest in the business the president had, although the president owned the majority of the stock and was the dominating head of the company." Griffin Grocery Co. v. Thaxton, 178 Ark. 736–739, 11 S.W.2d 473, 474. In this opinion the court distinguishes this case from Hale Hardware Co. v. Ragland, 165 Ark. 258, 263 S.W. 962. See also Van Wickle v. Satterfield, 58 Ark. 617, 25 S.W. 1113, 23 L.R.A. 853.

As said heretofore the three Bynums were employed because of their experience in the operation of stave mills, not only generally, but this particular stave mill. They were vested with discretion, were expected to use judgment and make decisions, and such men are not expected to unquestioningly obey orders. Seagram was not dealing with day laborers, but with men of special and technical knowledge gained by practical experience in this particular line of business. Viewing the business relations of Seagram and the Bynums as a whole, this $1000.00 transaction seems insignificant. There is no showing Seagram will have any considerable loss on this item, one way or another.

"There is an implied, if not an expressed, condition in a contract of employment that it was made with some regard to the known capabilities of the employe, and such condition is to be taken into consideration in determining whether or not a service required of him is reasonable.

"The refusal of a servant to obey an order of the master does not afford legal ground for his discharge unless such order was reasonable, and that question is one of fact for the jury, although the contract is in writing and requires him to perform such services as the master may direct, and the order is also in writing." Development Co. of America v. King, 2 Cir., 161 F. 91, 24 L.R.A.,N.S., 812.

"In an action for wrongful discharge, where it appears that the plaintiff was engaged for a long term of years as superintendent of a large and important business,

and was constantly obliged to represent the defendant in different states, and to attend with promptness, resoluteness, and good judgment to large pecuniary interests, it is proper to charge the jury that what would justify discharge of a mere clerk or workman might not justify the discharge of one like the plaintiff, and that where a contract has been substantially performed as to time and its most material parts the employer has no right to dismiss an employe for mere disobedience of general orders of a slight character, which involve no serious consequences or danger to the business, unless such disobedience is perverse or unreasonable." Park Brothers & Co., Limited, v. Bushnell, 2 Cir., 60 F. 583. Carpenter Steel Co. v. Norcross, 6 Cir., 204 F. 537, where the court cited Park Bros. v. Bushnell, supra, with approval.

The court is of the opinion that Seagram was not justified in discharging the three Bynums, employees, and they are entitled to recover judgment for the unpaid balance of their salaries, up to and including July 31, 1950.

In the settlement of May 31, 1947, Seagram deducted $4,078.00 for alleged damage to 4,078 sets of heading. The burden being upon Seagram, under the terms of the contract, to prove the payment of rentals according to the contract, it was incumbent upon Seagram to prove that this deduction was correct, by proving how, when and to what extent the damage occurred, and in what way it was the fault of the Bynums. At most, Bynums would be responsible for negligent manufacture caused by their personal negligence. The mill was, in effect, owned and operated by Seagram, and Seagram was the shipper, and before the Bynums could have been held responsible for this damage it must appear by a fair preponderance of the evidence that one of the Bynums negligently caused the damage through his personal negligence. It is not the same situation as the Bynums being shippers, selling heading to Seagram, and being negligent or liable for the negligence of their own employees. No such situation exists here. The Bynums are entitled to judgment for $4,078 on this item, with interest, from date payment was due.