[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff commenced this action by filing a three count complaint for damages against the named corporate defendant (Balmar) and its principal officers, Ronald Lemansky and Kathleen Lemensky, to recover back pay and other benefits pursuant to a written employment contract between the plaintiff and Balmar which he alleges was breached when he was wrongfully discharged on July 17, 1990, by Ronald Lemansky, vice president of Balmar, who was acting for the corporate defendant.
In the second count of the complaint the plaintiff sought to impose personal liability on the individual defendants based on the "instrumentality" rule which permits the court "to disregard the corporate fiction and impose liability on the real actor." Zaist v. Olson, 154 Conn. 563, 574-75. At the close of the plaintiff's case, the court granted the defendants' motion to CT Page 1261 dismiss the second count because "the mere breach of a corporate contract cannot of itself establish the basis for application of the instrumentality rule." Campisano v. Nardi, 212 Conn. 282,294.
The third count of the plaintiff's complaint and the sixth count of the defendants' counterclaim also alleged that the acts and conduct of the respective parties constituted violations of CUTPA (General Statutes sections 42-110a through 42-110q). In the course of the trial, the court ruled that the actual employment relationship is not itself "trade or commerce" within the meaning of the statute; see Kintner v. Nidec-Torin Corp.,662 F. Sup. 112, 113 (D.Conn. 1987); and that therefore, as a matter of law, neither party could be held liable under the statute.
In their answer the defendants admitted that the plaintiff and Balmar entered into a written employment agreement on March 6, 1987 which was admitted in evidence at the trial as Exhibit A. The contract stated that Balmar had agreed to purchase the "entire business and assets of Balmar Marine" which had been established by the plaintiff and his father and had been operated by them continuously until the time of the sale, and that both parties "mutually desire to assure the continuance of the Employee's services in connection with the said business."
The plaintiff was to be general manager, and in that capacity he was to "supervise and direct all the service operations of said business (subject always to the direction and control of the Board of Directors of the Employer). . .". he was to be employed for a period of five years from February 1st through November 30th of each year on a five day a week basis with equal time off during other days of the work week for any work on Saturday and Sunday.
Under paragraph 4 of the agreement, he was to be paid an annual salary of $40,000.00 plus "annual cost of living raises as determined by the Consumer Price Index." In addition, both he and his family were to be provided at no additional cost with medical insurance comparable to what they had when the plaintiff owned the business.
The agreement also provided that the plaintiff "shall be entitled to the use of one transporter license plate which shall be adequately insured by the Employer, together with a dealer boat registration and employer's supplied boat insurance." He was also given the right to purchase one boat of his choice each year from Balmar's stock "at its net cost, including usual boat accessories." CT Page 1262
Paragraph 5 of the agreement provides that "[t]he Employee shall devote his entire time, attention and energies to the business of the Employer during the aforesaid periods and shall assume and perform such further responsibilities and duties as may be assigned to him from time to time by the Employer and its Board of Directors." The defendants, in their second special defense and in their counterclaim, allege that the plaintiff violated this provision in that he failed "to devote his entire time, attention and energies" to the business of Balmar.
The plaintiff testified that he and his father, Harold Berger, had owned the business since its inception in 1972, and that they sold the business because his father wanted to retire. He stated that from March of 1987 until June of 1990 he had a very good business and social relationship with the Lemanskys and that his father also worked at Balmar after the business was sold.
Neither Mr. Lemansky, who is a chemical engineer and who continued to work as operations manager at the Torrington Company, nor Mrs. Lemansky, who was a registered nurse, had any prior experience in boat sales and service, and their purpose in hiring the plaintiff was to make certain that there would be continuity in the operation of the business. It was also agreed in one of the closing documents at the time of the sale (Defendants' Exhibit 13), that the Bergers and their corporation, Balmar Marine, Inc., were to use their best efforts to assist the defendants' corporation, Balmar Marine of Canton, Inc., to obtain a dealership with Mercury Marine Division of the Brunswick Corporation on terms substantially similar to those that had been obtained by the Bergers in 1985 and were to try to accomplish that prior to the expiration of that agreement in 1988.
The plaintiff testified that he fully complied with all of his obligations under the contract and that he devoted his "entire time, attention and energies" to Balmar's business throughout the course of his employment. He stated that the sole reason for his discharge on July 17, 1990, was the fact that he had intended to take a day off on July 20th without noting it on a vacation schedule form which Mrs. Lemansky had recently required all employees to fill out, that he was unable to find a substitute as Mr. Lemansky had requested him to do the day before, and that before he had a chance to explain that he had decided he would work that day, he was told that he was fired.
According to Mrs. Lemansky, the corporate decision to fire the plaintiff was made in a fifteen or twenty minute telephone conversation with her husband on the evening of July 16th which CT Page 1263 was apparently limited to the question of coverage for the following Friday. She stated that "we really agonized over it", and that the final decision was that "he didn't have to work, he didn't have to change his plans as long as he could find somebody to cover, it would have been fine for us."
Mr. Lemansky testified that the plaintiff was terminated as the result of a "aeries of acts of serious misconduct" that had occurred over a period of years. The only specific example that he gave of the "conversion" of inventory, as alleged in the third count of the counterclaim, was the removal of a Mercury 100 horsepower motor by the plaintiff in May, 1990.
Mrs. Lemansky testified that the plaintiff told her that he was interested in buying an engine and later came in and "threw" $2,400.00 on her desk on account of the purchase price. The plaintiff testified in rebuttal that he asked the defendants if he could buy the engine at its net cost with cash and credits due him, that they said that he could, that he marked it on the inventory cards, and that he never removed the engine or any other item of inventory without making arrangements to pay for it.
Mr. Lemansky also referred to two incidents involving customers, one of which occurred in 1987 and the other in 1988 for which the plaintiff was reprimanded. He also recounted an incident in 1987 when the Lemanskys were attending a dealer's meeting, when they were unable to call the office because it was the plaintiff's practice to take the phones off the hook when he was negotiating a sale with a customer and there was no one else to answer the phone.
He also learned shortly after the plaintiff was discharged that the plaintiff still maintained his original business checking account. The plaintiff testified that both parties contemplated the continued corporate existence of the Bergers' corporation at the time of the sale, that only two checks were written on the account for purposes unrelated to Balmar's business, and that the account was never used adversely to the interests of Balmar.
The defendants also offered into evidence invoices for purchases made from Minor Lumber Company, one of Balmar's suppliers, by the plaintiff, using Balmar's sales tax number. The plaintiff testified that the account had been used regularly when the Bergers owned the business, that the account number was not changed and the invoices were mailed to the plaintiff, that he paid for his own personal purchases, and that Mrs. Lemansky must have been aware of this because he gave her the bills that had actually been incurred on Balmar's account. CT Page 1264
The defendants also offered evidence to show that the transporter license plate was used on the plaintiff's personal vehicle and the dealer boat registration for his boat which they claim were improper uses under the terms of the employment agreement. Mrs. Lemansky acknowledged that she used the plate when she needed it and then returned it to him, and the plaintiff testified that the defendants never told him that his use of the plate or the registration was illegal or in violation of the terms of the employment agreement.
At the conclusion of Mr. Lemansky's testimony, he denied the plaintiff's statement that he was highly agitated and upset when he fired him, and that he gave the plaintiff every opportunity to tell him that he had changed his mind and would work the following Friday after all. He also testified that he didn't think that he would have discharged the plaintiff if he had come to work on that day.
On the first day of the trial, Mrs. Lemansky was called as a witness by the plaintiff to describe the circumstances under which she and her husband were served subpoenas duces tecum prior to the trial. The return of service stated that the subpoenas had been read in their presence and hearing.
Mrs. Lemansky testified that a man put a subpoena on her desk, and that he did not ask her name or say anything to her. Mr. Lemansky's testimony was that the person who purported to serve him did not hand it to him but left the subpoena on the desk and that he did not read it to him.
Leonard Revoir, an administrator at the New Britain General Hospital, who served the subpoenas as an indifferent person, testified that he identified himself by name when he entered the office, that they were given copies, that they were both reading them in his presence and that although he did not read the entire subpoena he read the name of the plaintiff and stated that it required them to produce certain corporate records. The plaintiff claims that this conflict in testimony should have a significant bearing on the court's assessment of the defendants' credibility in other areas of their testimony in the course of the trial.
The defendants did not offer any evidence to contradict or to mitigate the plaintiff's proof of damages, but denied that they were liable to the plaintiff for any damages other than the sum of $4,447.59 for twenty-one accumulated "days off" in 1990 for which he had not been paid. In addition to that amount, the plaintiff's claim for lost wages was $24,908.79 for 1990 and $46,728.90 for 1991 making a total of $76,085.28 CT Page 1265 for lost wages and uncompensated days off.
Proof of lost benefits pursuant to the employment contract by reason of the breach was as follows:
Medical Insurance
November 1990-April 1991 $ 2,444.22
Car Registration 80.00
 Car Insurance — July 1990-November 1991 1,200.00 ----------- $ 3,724.22
TOTAL $79,809.50
The plaintiff also offered evidence in mitigation of his total claim for damages as follows:
Unemployment July-November, 1990 $ 4,794.00
Unemployment February-April, 1991 2,820.00
 Earned Income (New Job) April-November, 1991 17,000.00 ---------- $24,614.00
The plaintiff's net claim for damages is the difference between $79,809.50, his total claim for lost wages and contractual benefits, and $24,614.00, by way of mitigation of damages, or $55,195.50.
The plaintiff argues that by the defendants' own admissions in the course of the trial the sole cause for his discharge was Mr. Lemansky's mistaken belief that the plaintiff still intended to take his planned day off after he learned that he could not get someone else to cover for him, and that such "cause" in and of itself did not justify the employer's decision to terminate his employment. The defendants' claim, as noted in their brief (p. 3), is that "[t]he employer may take into account an employee's entire course of conduct in deciding to discharge him, and even if some infraction has been condoned, it is deemed that such was on condition that the employee's future conduct would be proper." (citing Heyman v. Kline, 344 F. Supp. 1088, 1101 (D.Conn. 1970). (Emphasis added).
An employer has, at all times, the power to dismiss [an employee but he makes] himself responsible for the consequences CT Page 1266 when he dismisses [him] without cause. Champion v. Hartshorne,9 Conn. 564, 569. "[M]oral misconduct, pecuniary or otherwise, as well as wilful disobedience, or habitual neglect, is good cause for the dismissal of [an employee]." Id. 560.
There is an implied condition in all contracts of employment that the employee "will perform the duties incident to his employment honestly, and will do nothing injurious to his employer's interest, and that if he proves radically unfaithful to his trust or is guilty of gross misconduct he forfeits all right to compensation." Phoenix Mutual Life Insurance Co. v. Holloway,51 Conn. 310 at 314. An employee has the right to continue in his employment so long as he faithfully performs his duties, and his removal without cause entitles him to recover damages. Id. 315. "Just cause" substantially limits the employer's discretion to terminate, by requiring the employer to show a proper reason for dismissal, and by forbidding the employer to act arbitrarily or capriciously. Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471,475. An employment contract for a definite term may be terminated by either party only for good or just cause (as distinguished from the standard of unsatisfactory service) which is defined as a `substantial reason, one that affords a legal excuse [or a] legally sufficient ground or reason.' Slifkin v. Condec Corporation, 13 Conn. App. 538, 549.
Not every act of insubordination or misconduct justifies an employer in firing an employee, because if that were the case, if an employee's conduct and performance were less than perfect he could be discharged for "just cause". Resilient Floor 
Decorative Covering Workers v. Welco Manufacturing Co., 542 F.2d 1029,1032-33 n. 4 (8th Cir. 1976). In the case of a managerial employee, in particular, whose position gives him "some latitude and discretion in working out the details of his service, a failure immediately and literally to comply with the master's orders may not constitute disobedience, and it is a question of fact for the jury in each case whether the limits of that latitude and discretion have been exceeded. . .". Pollak v. Danbury Manufacturing Co., 103 Conn. 553, 558.
There may also, of course, be derelictions of duty by an employee that are "so trivial or inconsequential that the law will not take note of them." Id. Slight or occasional omissions do not constitute conduct justifying dismissal, the proper test being "whether the conduct is so inconsistent with the employer-employee relationship that it prejudices a valid business interest of the employer", which is ordinarily a question of fact, with the burden on the employer to justify the discharge. Brock v. Mutual Reports, Inc., 397 A.2d 149, 153
(D.C.App. 1979). CT Page 1267
If an employer retains an employee after he has knowledge of misconduct warranting his discharge, "such retention is prima facie a waiver, and condonation is presumed, unless circumstances are shown that tend to establish a reasonable and proper reason for the delay." In Re Nagel, 278 F. 105, 110 (2d Cir. 1921). Where the employer makes no complaint about the employee's conduct when he was aware of it, and waits until the matter is in litigation to assert it as a defense, such delay tends to show that there was nothing in the employee's conduct to justify his discharge and that the assertion of such claims "was purely an afterthought" prompted by considerations of trial strategy. Carpenter Steel v. Norcross, 204 F. 537, 545 (6th Cir. 1913).
It may be argued that if the employer delays the discharge of the employee in order to investigate the facts he may lose the right to discharge him, and if he discharges him on the spot, the employer runs the risk of having acted on insufficient information thereby exposing himself to a potentially sizeable backpay award at a later date for wrongful discharge. See County College of Morris Staff Association v. County College of Morris, 495 A.2d 865, 873 (N.J. 1985). Nevertheless, the employer "may not quietly warehouse violations and then act, without prior warning", because his inaction "projects a sense of tacit approval" thereby contributing to the ongoing breach and giving the employee a false sense of security. Id. 875.
In this case, the defendants' principal argument is that the defendants could properly take into account the plaintiff's "entire course of conduct" in deciding to discharge him under the rule stated in Heyman v. Kline, 344 F. Sup. 1088, 1101 (D.Conn. 1970). However, the defendants have offered no evidence whatsoever to show that the telephone conversation between the Lemanskys on the evening of July 16, 1990, which resulted in the "corporate" decision to fire the plaintiff the next day related to any subject other than the question of "coverage", or that Mr. Lemansky mentioned any of "the series of acts of serious misconduct" was he characterized them in his testimony) which are alleged in the defendants' responsive pleadings when he told the plaintiff the next day that he had been fired.
Assuming, arguendo, that the plaintiff's apparent refusal to work the following Friday or to obtain a substitute was in and of itself a sufficient cause for his discharge, the court accepts as credible the plaintiff's testimony that he was not given an opportunity to tell Mr. Lemansky that he had decided to work that day after all. The court rejects the defendant's testimony to the contrary because it is not consistent with the other credible evidence concerning the surrounding circumstances and also because the impeachment of his testimony early in the trial concerning the service of the subpoenas on himself and his wife significantly CT Page 1268 affects the weight to be given to his testimony on the more crucial issue of what actually occurred in the course of his meeting with the plaintiff on July 17, 1990. Cf. Heyman v. Kline, 344 F. Sup. 1088,1105 (D.Conn. 1970).
For the foregoing reasons, the court concludes that, based upon all of the credible evidence before it, the defendant, Balmar Marine of Canton, Inc., discharged the plaintiff on July 17, 1990, without good or just cause, and that he is therefore entitled to recover the wages and other contractual benefits that he lost by reason of the premature and unjustified termination of his employment by Balmar.
Accordingly, the court finds the issues for the plaintiff against the corporate defendant on the first count of the complaint and finds the issues for the plaintiff against the corporate defendant on its counterclaim.
Judgment may enter in favor of the plaintiff against the defendant, Balmar Marine of Canton, Inc., in the amount of $55,195.50.
Hammer, J.